Lee **HOFFMAN**
v.
The **UNITED STATES.**
No. 259–59.

United States Court of Claims.
May 15, 1964.

646

John L. Schwabe, Portland, Or., for plaintiff.

Mary J. Turner, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant. Mary K. Fagan, Washington, D. C., on the brief.

Before JONES, Chief Judge, and LARAMORE, DURFEE and DAVIS, Judges.

DURFEE, Judge.*

Plaintiff claims additional compensation for increased costs under the "changed conditions" provision of a contract with defendant for construction of a railroad bridge in Oregon. This construction was part of a Federal dam project which required the relocation of highway and railroad facilities in the State of Oregon. The entire project also included construction, at about the same time, of a highway bridge parallel to and immediately upstream from plaintiff's railroad bridge project on the Deschutes River. The highway bridge was constructed by another company, Young & Smith, under an earlier contract with the State of Oregon, which had the prime contract with defendant for construction of this highway bridge.

Prior to plaintiff's bid on the railroad bridge, Young & Smith had been awarded the sub-contract for the highway bridge by the State of Oregon. It had planned a cofferdam across part of the river above the highway bridge to facilitate and protect its construction, and had quarried the rock therefor. Upon learning that plaintiff was the low bidder for the railroad bridge immediately below,[1] Young & Smith proposed sharing the cost of its cofferdam with plaintiff, together with other cooperative proposals such as sharing equipment. Plaintiff replied that he could make no commitment until he knew that he was to be awarded his contract. During the next two weeks, the parties were unable to arrange a meeting, and Young & Smith proceeded to build its cofferdam.

Prior to construction of the Young & Smith cofferdam above the highway bridge upstream, the normal width of the river at this location was 200 to 250 feet. The distance between the two railroad bridge abutments on the east and west river banks was about 500 feet, and the main channel, before construction of the Young & Smith cofferdam upstream would have run approximately under the middle area of the proposed railroad bridge.[2]

Plaintiff's railroad bridge project downstream and Young & Smith's highway bridge project upstream were to be constructed parallel in an east-west direction, and less than 68 feet apart. Plaintiff's plans for the railroad bridge

---

* Trial Commissioner Herbert N. Maletz, at the direction of the court, prepared recommended ultimate findings in this case, which were of substantial assistance.

1. The two bridges were separated by a distance of about 68 feet from their centerlines. (Fdg. 6(a)).

2. Finding 10—"between the proposed location of Piers 3 and 4."

called for bridge support by a masonry abutment (Number 2) on the east bank of the river, another abutment (Number 1) on the west bank of the river, and intermediate piers in the river channel numbered 1 to 5 from west to east.

The plans for Young & Smith's highway bridge called for supports called "bents," numbered 1 to 9 from west to east. Bents 1 and 9 had the same purpose as Abutments 1 and 2 of the railroad bridge, and Bents 2 to 8 the same purpose as Piers 1 to 5 of the railroad bridge. The highway bridge upstream was to extend longitudinally farther both west and east than the railroad bridge, with its Bent 1 lying slightly west of Abutment 1 of the railroad bridge, and Bent 9 lying slightly east of Abutment 2. The relative location of the proposed highway and railroad bridges is depicted in the following diagram:

*Relative Location of Relocated Highway and Railroad Bridges*

## YOUNG & SMITH'S CONSTRUCTION OF A COFFERDAM

According to the contract drawings of the Corps of Engineers, it could be reasonably estimated that during the period of construction under plaintiff's contract, about 1½ feet of water would be touching Abutment 2 of the railroad bridge on the east side of the river, and about 2½ feet of water would be around the furthermost pier (Number 5) on the east side. This would not create a major water problem. From his investigation of the site and defendant's water-flow charts before and after bidding on the railroad bridge contract, plaintiff was justified in concluding that the amount of water around Abutment 2 and Pier 5 at the east side of the river would not be substantial during the construction

period, and that elaborate cofferdamming would not be necessary.

Plaintiff received notice from defendant to proceed with his contract for the railroad bridge on July 6, 1954. By this time Young & Smith had completed construction of its cofferdam above the highway bridge upstream. This cofferdam was a solid and continuous rock and sandfill barrier extending from Bent 1 of the highway bridge on the east bank of the river west across two-thirds of the channel to Bent 7. The two bridge sites are located at the bottom of swift rapids and the Young & Smith cofferdam diverted the entire flow of the river from the wide central main channel to a new narrow channel on the east side. As a result, the entire river then passed over the "normally high and dry" location of plaintiff's east Abutment 2 and Pier 5 for the railroad bridge with considerable added depth, speed and force. A better method of dewatering by Young & Smith under accepted engineering practice would have been construction of a series of individual cofferdams at each of the nine highway bridge "bents" or piers connected by temporary bridging for access. This established method would not have diverted the central main channel to the east one-third of the river bed, and this was the method that plaintiff planned to use when he had also bid on the highway bridge.

Because of this unexpected river diversion confronting plaintiff on the day he was authorized to start construction, he delayed his operations on the east side of the river, and proceeded with construction only on the west side at Abutment 1, Piers 1 and 2, which was now relatively dry. At various times shortly after receiving notice to proceed, plaintiff asserted orally and in writing to defendant's representatives that these changed conditions at the site had resulted from the Young & Smith cofferdam a short distance upstream. Plaintiff asserted that Abutment 2 could only be constructed after he first built a cofferdam there at great increase in cost. He stated that the combination of this cof-

ferdam with that of Young & Smith's immediately upstream would result in virtually damming the entire river, thus causing extreme danger to the cofferdam upstream, to life and to property.

Plaintiff accordingly requested the contracting officer orally and in writing to issue a stop order on construction of Abutment 2, the site of which was now under what plaintiff described as "a great howling mass of water." He also requested an extension of the completion date thereon until Young & Smith had completed its work upstream to the stage where it could pull its cofferdam back west more to the former center of the channel, and thus eliminate the flooded condition on the east side of the river at Abutment 2 and Pier 5. He asserted that these circumstances were changed conditions under the contract throughout a series of conferences and correspondence extending from early in August through the middle of September, 1954.

To these allegations of changed conditions by plaintiff and to his request for a stop order on Abutment 2, the contracting officer replied that there was no evidence of changed conditions within the meaning of the contract or as a basis for issuance of a stop order or time extension for completion of the abutments, and refused to issue the stop order on Abutment 2.

■ Upon appeal by plaintiff from the contracting officer's findings and decision pursuant to the disputes provision of the contract, the Board of Contract Appeals decided:

"Undoubtedly, the appellant when he submitted his bid did so without giving any consideration to a possible diversion of the main stream from its channel to the location of the east abutment. This diversion was not mentioned in the contract documents. When he encountered this condition on the job he felt it to be a changed condition under the terms of the contract. It was not a subsurface or latent physical condition at the site differing from those

indicated in the contract. It was instead a strictly man-made condition caused by the operations of another independent contractor, and dependent upon his discretion and judgment. Appellant's contract included the information that other contractors would be working on the site and required cooperation between them. There was nothing unusual under these circumstances with respect to river diversion. It was to be expected. In order to accomplish the desired construction on both contracts, either diversion or some other method of river control was mandatory. The method was properly left to the successful bidders. The diversion as accomplished was not an unknown physical condition at the site of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." (Fdg. 29(d)).

On the basis of the administrative record before the Board, we conclude that this portion of the Board's decision is erroneous as a matter of law and is not supported by substantial evidence.

Both the highway and the railroad bridge contract enjoined mutual cooperation. Furthermore, such cooperation between contractors is to be expected on a project of this kind. However, it is found from the great weight of the testimony, that there was very little or nothing that plaintiff could do by way of cooperating with the other contractor in his construction of the upstream cofferdam. In the first place, when submitting his bid, plaintiff could not cooperate with Young & Smith since the latter was a rival for that contract, as were the two for the highway bridge contract. Secondly, when Young & Smith's general superintendent, Mr. Thatcher, telephoned plaintiff, after the railroad bids were opened, Mr. Thatcher testified that his plans had already been made for building a solid barrier from the west bank to Bent 6; *that this was what he was going to do in any event.* Moreover, at the time in question, Mr. Thatcher himself did not anticipate that water conditions at Bent 6 would make it necessary to extend his cofferdam further east to Bent 7. Third, the primary purpose of Mr. Thatcher's call was not to obtain plaintiff's cooperation but to suggest that plaintiff share in the cofferdam's cost. While the record is clear that plaintiff did not respond to this suggestion with alacrity or enthusiasm, the record is equally clear that plaintiff could scarcely expect that Mr. Thatcher would dam the river even further east to the Bent 7 location, causing it to flow over the Abutment 2 location with considerable depth, velocity and force. Yet this was precisely the situation confronting plaintiff when on July 6 he received notice to proceed on the contract. Thereafter, plaintiff tried to secure cooperation by asking the contracting officer to direct the State Highway Department or its subcontractor, Young & Smith, to cut back its cofferdam east to the center of the river, so as to lessen the effect of the greatly increased force and depth of the flow of the diverted river at Abutment 2 and Pier 2 of the railroad bridge directly below.

Article 3(b) of defendant's contract with the State for the highway bridge required:

"b. The Government may award other contracts for additional or other work in connection with the same project or in the same vicinity. The State shall conduct operations so as to cooperate fully with any such work being performed by the Government and/or Government contractors and *shall carefully fit its own work to that provided under other contracts as directed by the Contracting Officer.* The State shall not commit or permit any act which may interfere with the performance of any such work by the Government and/or any Government contractor." (See Findings—Appendix D) [Emphasis supplied.]

Not only did the contracting officer refuse to invoke this clear authority to direct the State to cooperate in the performance of its contract with defendant, he responded to plaintiff's request as follows:

> "It is the position of this office that it is incumbent upon you to meet fully the requirements of your contract, to cooperate and coordinate your efforts with the State contractor for your mutual benefit, *and to adhere strictly to the completion schedules set forth in your contract,* or as they may be modified.

> "In this connection you are further advised that the State's operations are not under any direction or authority of this office, nor is there any privity of contract existing between this office and the State contractor.

> "In short, it must be considered that any direct damages inflicted upon your work by the activity of the State contractor would be in the nature of a tortious action and beyond any contractual rights controlled by the Government." [Emphasis supplied.]

Plaintiff appealed from this decision to the Board of Contract Appeals on November 26th. Coincidentally, on the same day, the contracting officer agreed to extend the time for plaintiff to complete the abutments by fifty days. This was done by a modification of the contract which recited that it had been determined that "delay in the performance of the contract was due to causes beyond (plaintiff's) control and without (his) fault or negligence, *namely, acts of another contractor (The State of Oregon) in the performance of a contract with the Government.*" [Emphasis supplied.]

The final decision of the Board of Contract Appeals, in referring to cooperation between the two contractors, concluded:

> "Both contracts enjoined mutual cooperation. Such cooperation is to be expected on any project and of necessity is an inherent ingredient of the construction industry. From the very outset of this project it was not achieved between two contractors, each of whom has bid on both contracts and were fully conversant with its extreme importance. The contracting officer is not designated by the contract as the arbiter and quite properly refused to take sides in the matter. When it was made evident to him that the scheduled completion of the abutments could not be timely accomplished because of interference he granted an extension."

 We conclude that this portion of the Board's decision is likewise legally erroneous and unsupported by substantial evidence. It completely disregarded the rights of plaintiff to cooperation from the contractor upstream whose acts were the cause of plaintiff's difficulties (as found by the contracting officer). These rights inured through the right of the Government to require cooperation from this subcontractor through the Government contract with the prime contractor, the State of Oregon. There is no evidence that defendant ever attempted to secure this cooperation, other than arranging for one unsuccessful conference with Young & Smith who refused to make any changes "because nobody offered to pay for it."

While the Government placed great stress in its contracts with plaintiff and the State of Oregon on the necessity for mutual cooperation, it completely disregarded the rights of plaintiff to cooperation from the contractor upstream. For the Board to say, under circumstances where the contracting officer himself found the acts of the contractor upstream to be the cause of plaintiff's delay, that "the contracting officer is not designated by the contract as the arbiter and quite properly refused to take sides in the matter," is a complete and unwarranted disavowal of all responsibility on the part of the Government to direct or require cooperation from anyone (except plaintiff). Such a conclusion by the Board

is erroneous as a matter of law and not supported by the substantial evidence in the administrative record.

One of the principal contentions of defendant is that a manmade condition which could have been avoided by cooperation of the two contractors involved is not a changed condition within the purview of the Changed Conditions Clause of the contract. The condition which confronted plaintiff on July 6, 1954, when it was authorized to proceed with its contract, was diversion of the river flow by the upstream contractor. This diversion, as the contracting officer found, "was due to causes beyond (plaintiff's) control and without (his) fault or negligence, namely, acts of another contractor in the performance of a contract with the Government." These were acts of the upstream contractor which plaintiff could not reasonably have expected or foreseen, and they were acts which created a changed condition in the flow of the river which existed when plaintiff was directed to proceed with his contract. The decision of the Board of Contract Appeals fails to point out where plaintiff failed to cooperate in avoiding this changed condition, "man made" by the other contractor before plaintiff even had authority from defendant to proceed with construction. This changed condition was the direct cause of plaintiff's subsequent difficulty and delay in construction, and was clearly within the purview of the Changed Conditions Clause of the contract. The modification of plaintiff's contract, and extension of time subsequently adopted by the Government as a result of this changed condition were accepted under protest by plaintiff. Plaintiff was accordingly entitled to increased compensation under Article 4 of the contract, but this claim was refused by the contracting officer. The Board's concurring decision in this regard is likewise legally erroneous and unsupported by substantial evidence in the administrative record.

Defendant has also contended that the use of the administrative record by this court is limited to proof of what was before the Board of Contract Appeals to support or not to support its decision. Defendant submits that "a reading of the Commissioner's report herein, one adverse to the defendant on the liability issue and diametrically opposed to the Board's decision, will show that it has treated evidence before the Board and prior testimony in a District Court proceeding as though they were direct evidence in a trial *de novo* in this court, deciding questions of credibility, irreconcilable conflicts in plaintiff's utterances, and the weight of the evidence in plaintiff's favor."

By agreement of the parties before the trial, the evidence in this case is entirely documentary and consists primarily of the administrative record before the Board. The remaining evidence consists of the record of certain proceedings before the United States District Court, District of Oregon, in an action brought against plaintiff by another contractor known as Young & Smith Construction Co. Also by agreement of the parties, the evidence in this case, including the administrative record before the Board, was offered and received without limitation of any kind.

■ Plaintiff's petition fails to allege that the Board's decision is not supported by substantial evidence, but does assert that the decision was arbitrary and capricious. However, the Disputes Article here involved was approved for use before enactment of the Wunderlich Act, and does not contain the "substantial evidence" phraseology thereafter incorporated into the law and most dispute provisions. Plaintiff's defect in pleading is one of form and not of substance.

The Trial Commissioner's conclusion as to changed conditions (Finding 30(a)) states:

"On the basis of the administrative record before the Board, it is found as a fact, first that the Board's decision is not supported by substantial evidence."

■ Throughout the findings, the Trial Commissioner refers to the "great

weight of evidence before the Board" in concluding that its decision was not supported by substantial evidence. Because of the "trial *de novo*" issue raised by defendant, we have analyzed the evidence in the administrative record below in detail upon which the Commissioner placed sole reliance in his opinion. We find that the Trial Commissioner correctly concluded, solely upon the administrative record, that the decision of the Board of Contract Appeals is not supported by substantial evidence. We further find that the Commissioner did not consider the evidentiary record as though produced at an actual trial *de novo* before him even though the parties may have stipulated that the record below be submitted to him without limitation.

Defendant urges that the criterion set forth in T. C. Bateson Co. v. United States, 149 Ct.Cl. 514, 518 (1960) that substantial evidence means "such evidence as might convince a reasonable man, to support the conclusion reached by the agency officials," is fully met in this case. Even were we to assume that there is some evidence which, standing alone, might convince a reasonable man to support the Board's conclusion, this, in and of itself would not be sufficient here. As we stated, in Williams v. United States, 127 F.Supp. 617, 619, 130 Ct.Cl. 435, 441, cert. denied, 349 U.S. 938, 75 S.Ct. 783, 99 L.Ed. 1266 (1955):

> "The fact that there is evidence, considered of and by itself, to support the administrative decision is not sufficient where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole."

■ We find on the basis of the administrative record (see United States v. Carlo Bianchi & Co., 373 U.S. 709, 717, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963)), that plaintiff is entitled to recover on its claim but that the amount of recovery sought should be reduced as follows:

1. Considering the water conditions prevailing in the Abutment 2 area on September 11, it is found that plaintiff could and should have adopted a less expensive and more feasible method for dewatering than the construction of a rock jetty and cofferdam at the job site. The preferable method would have involved construction at the abutment area of a rock-fill island connected to the bank by a temporary bridge. Accordingly, the amount of any equitable adjustment for increased costs to plaintiff for increased cofferdamming should be based on an island-type cofferdam rather than on the solid type installed by plaintiff.

2. It is found that plaintiff benefited from the Young & Smith cofferdam by being able to construct various substructures at the west side of the bridge, under dry conditions, particularly Pier 3. For that reason, any equitable adjustment for increased costs to plaintiff should be reduced by the amount of such monetary benefits.

3. Prior to the Board hearing, plaintiff filed an amended claim with the contracting officer for the additional sum of $17,324.00 which represented the amount claimed against him by Young & Smith for damages to its highway bridge cofferdam.

■ The Board declined to consider this claim, and plaintiff has asserted it separately in his petition here. This is the only item outside of the administrative record. Plaintiff introduced no proof here on this claim. Defendant introduced pleadings and two depositions in an action brought by Young & Smith against Lee Hoffman (the instant plaintiff) in the United States District Court of Oregon. This action was dismissed by order of the District Court in April of 1958, and the parties stipulated that their respective claims in that case "were washed out—against one another." No payments were made to Young & Smith by plaintiff. Accordingly, plaintiff is not entitled to recover in any amount on this claim for $17,324.00.

Finally, we conclude, upon the record as stipulated by the parties, that plaintiff is entitled to recover an equitable ad-

justment for increased costs from Changed Conditions as prescribed in his contract with the Government, with the amount of recovery to be determined pursuant to Rule No. 47(c) (2). Judgment is entered accordingly.