**FARNSWORTH & CHAMBERS CO., Inc.**
**v.**
**The UNITED STATES.**
**No. 276–60.**

United States Court of Claims.
June 11, 1965.

Wilson Sims, Nashville, Tenn., for plaintiff. Bass, Berry & Sims, Nashville, Tenn., of counsel.

R. W. Koskinen, Oakland, Cal., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

DAVIS, Judge.[1]

This is a claim for $71,168.26 based upon extra work required under a construction contract because of an allegedly unforeseen "changed condition" not indicated by the contract documents or a reasonable pre-award survey of the area. Plaintiff contracted with the Corps of Engineers, in February 1954, to build the power house for the Old Hickory Dam on the Cumberland River near Nashville, Tennessee. Part of the work required the completion and dewatering of a cofferdam enclosing the place where the power house was to be located.[2] Meeting great difficulty in pumping water out of the cofferdam area, plaintiff attributed most of the trouble to a large but unknown subterranean cavern which, in its view, was allowing water to rush back into the cofferdam area in opposition to the pumping. Considerable work had to be done to stem this flow back into the cofferdam. An equitable adjustment was sought from the contracting officer under the Changed Conditions article,[3] but was denied. On appeal, the Corps of Engineers Claims and Appeals Board ruled (in January 1960) that the contractor had failed to prove the existence of a cavern or channel sufficiently large to cause the difficulty of which plaintiff complains; the Board thought, in addition, that the leakage from the cofferdam was probably due to plaintiff's faulty work, as well as to flows through an adjacent timber crib (for which the plaintiff had already been compensated in a prior proceeding). This suit followed.

The first question is whether a large opening in the bed of the river (a crevice, cavern, channel, trench, or hole)—if one was encountered—would constitute a changed condition for which an equitable adjustment could be sought.[4]

1. Trial Commissioner Paul H. McMurray prepared an opinion and findings which have been of substantial assistance.

   The court's opinion embodies the necessary findings of fact made by the court.

2. Another contractor (the Jones-Tompkins Companies) had built the dam proper and in that connection had constructed part of the cofferdam to be completed by plaintiff.

3. Article 4, on Changed Conditions, provided: "The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) Subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the contractor for adjustment hereunder shall not be allowed unless he has given notice as above required; provided that the Contracting Officer may, if he determines the facts so justify, consider and adjust any such claim asserted before the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof."

4. The Claims and Appeals Board found it unnecessary to reach this issue since it decided that no such large opening had been shown.

   Both parties agree that this case is to be determined solely on the administrative record, and neither side has introduced any *de novo* evidence. Under United States v. Carlo Bianchi & Co., 373 U.S. 709, 717, 83 S.Ct. 1409, 10 L.Ed.2d

In this agreement, as in most construction contracts, one test of a changed condition is whether the contractor met "an unknown subsurface condition differing materially from that shown by the drawings, specifications and borings, and one which could not have reasonably been anticipated from a study of the drawings, specifications and borings, or by an examination of the site." General Casualty Co. v. United States, 127 F.Supp. 805, 812, 130 Ct.Cl. 520, 532, cert. denied, 349 U.S. 938, 75 S.Ct. 783, 99 L.Ed. 1266 (1955); Shepherd v. United States, 113 F.Supp. 648, 654, 125 Ct.Cl. 724, 737 (1953). We read the administrative record as compelling the conclusion that this test was satisfied. The great weight of the evidence is that the core borings gave the plaintiff no adequate reason to believe that a large water-bearing opening underlay the edge of the cofferdam area to be dewatered; all the indications were, rather, that the leakage to be expected would be within normal range and could be handled by an ordinary program including grouting. See the testimony of Mr. Mitchell; the detailed testimony of Dr. Wheeler; and the testimony of Dr. Philbrick at Tr. 145, 148–49, 153.[5] A trench or opening of large magnitude would obviously multiply the expected difficulties of dewatering—by creating a considerable passageway for the water to continue to return to the cofferdam area in force—and would thus constitute a "changed condition" against which the contractor was not supposed to insure by loading his bid.[6] See, e. g., Joseph Meltzer, Inc. of New Jersey v. United States, 77 F.Supp. 1018, 1019–1020, 111 Ct.Cl. 389, 478–481 (1948); Shepherd v. United States, supra. The contractual requirement that plaintiff make its own in-

---

652 (1963), we can decide the factual issues relating to this phase of the case—which the Board failed to decide—on the basis of the Board record, at least if that record points decisively in one direction.

5. The core borings showed, in ten of the holes in plaintiff's construction area, some stained and bleached bedding planes and that drill water was lost near the surface in some of the holes. Mr. Mitchell, plaintiff's representative, testified that he examined the core borings in plaintiff's area and that for the most part they showed good, solid, clean, or suitable conditions for his purposes—not leading one to anticipate a large cavity or opening, though they might call for grouting to seal off normal leakage through pervious rock. Dr. Wheeler, plaintiff's geologist, also testified, in detail and at length, that the borings did not suggest any large openings or caverns in the bed of the river. Dr. Philbrick, defendant's geologist, testified that, though he thought an open cavity might have been adjacent to one of the core boring holes, he knew of no boring holes (other than two) which showed a cavity larger than six inches anywhere; the cavities in the two "bad" holes appear to have been larger but not of the size plaintiff claims to have encountered. Dr. Philbrick, Dr. Wheeler, and Mr. Mitchell all testified that the type of bedding planes and joints shown by the core borings would have been closed by a normal grouting program.

The dam contractor for the Old Hickory Dam (see fn. 2, supra) had encountered a changed condition (a deeply weathered zone of rock) for which it was awarded an equitable adjustment by the Engineers Claims and Appeals Board. Jones-Tompkins Companies, Eng. C&A Board, Decision No. 767, dated August 28, 1958. The Government argued there, as here, that the core borings put the contractor on notice, but the Board held that physical indications which were merely "*suggestive* of the *probability* that solution phenomena *might* be encountered" (the Board's emphasis) were "surely not sufficient to place this appellant on notice of what it did in fact encounter." The same comment is directly applicable to the present case.

6. Although the Board did not decide whether a large opening would constitute a changed condition, it did find that plaintiff knew from the borings that "the subsurface rock structures were pervious to water flows to an extent posing problems in dewatering the cofferdam area for construction of the powerhouse 'in the dry'." This finding, as worded, does not say or suggest that plaintiff should have expected the kind of problems coming from a large opening. If the finding was so intended, it has no substantial support in the record as a whole. See footnote 5, supra.

vestigation of the site does not obliterate the Changed Conditions clause, nor did this requirement obligate bidders to discover, at their peril, subsurface conditions hidden by the river's water and thus unavailable to any reasonable pre-award inspection. See Fehlhaber Corp. v. United States, 151 F.Supp. 817, 825, 138 Ct.Cl. 571, 583–585, cert. denied, 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957); Kaiser Industries Corp. v. United States, Ct.Cl., 340 F.2d 322, 329–330 decided Jan. 22, 1965; Loftis v. United States, 76 F.Supp. 816, 825–826, 110 Ct.Cl. 551, 627–629 (1948). From its knowledge of the prior experience of the dam contractor for the Old Hickory Dam project (see fns. 2 and 5, supra), the *defendant* may have acquired some special knowledge or apprehension causing its representatives to believe that "anything" might happen in plaintiff's powerhouse area, but this special knowledge or feeling was not communicated to plaintiff which had no such reason to be fearful. Cf. John A. Johnson Contracting Corp. v. United States, 132 F. Supp. 698, 702, 132 Ct.Cl. 645, 653–655 (1955).

▪▪ The next question is whether plaintiff properly invoked the Changed Conditions article. A few days after it began to have reason to believe that there was some large underwater passage or connection between the cofferdam area and the rest of the river, the plaintiff wrote to the defendant, on August 10, 1954, making a claim under the contract for a changed condition in general terms. The letter said that "we refer specifically to the area adjacent to downstream cofferdam Cell No. 5. This area is also in the immediate vicinity of your indicated test boring No. 95." Plaintiff did not mention a large cavern, channel, trench, crevice or hole, nor did it specify the dimensions of the opening which its witness later brought out at the Board

hearing. Defendant's position is that this notice was inadequate because not enough detail was given. Since the contracting officer and the Board both considered the claim on its merits, it may well be that the latter part of the Changed Conditions clause (see fn. 3, supra) precludes the defendant from now relying on lack of proper notice.[7] In any event, we hold that the notice was sufficient.[8] Under this Changed Conditions article, the defendant has the duty, once notice is given, to investigate the existence, nature, extent, and validity of the contractor's claim. It is not necessary that the allegedly new condition be set forth specifically and in detail. It is enough if the Government knows that the contractor is claiming such a condition in a certain area; no formal or technical requirements have been imposed. See General Casualty Co. v. United States, supra, 127 F.Supp. at 812–813, 130 Ct.Cl. at 533–534; Shepherd v. United States, supra, 113 F.Supp. at 650–652, 125 Ct.Cl. at 729–730, 731–732. The contracting officer in this case could not have been unaware that the plaintiff was referring to an underwater condition, at or near cofferdam Cell D–5, which caused water to flow back into the cofferdam with considerable force; the plaintiff had been struggling with the problem of gross leakage for several days and the defendant's representatives had been attributing the trouble to plaintiff's faulty work. Plaintiff was obviously saying, in its written claim of August 10th, that the fault was not its, but an unforeseen and unforeseeable condition in the bed of the river near the edge of the cofferdam. The Government therefore had adequate notice that something in the physical conditions was claimed to be amiss. The fact that plaintiff later sought to make its claim more precise does not deprive that original notice of effectiveness.

---

7. The board did not mention this point, although it did comment that plaintiff failed to inform the Government prior to completion of the contract of the precise type and dimensions of the changed condition.

8. The question of the adequacy of the notice is one of law. Shepherd v. United States, supra, 113 F.Supp. at 650, 125 Ct.Cl. at 729.

■ A related point is that the contractor improperly disturbed conditions —contrary to the contract article—by placing concrete and other material in the cofferdam area (in order to plug the leak) before notifying the defendant and giving the Government the chance to investigate.[9] There might have been some merit to this defense (assuming its availability) if there were any indication in the record that the Government's representatives wished to make an immediate, on-the-spot, inquiry. But the contracting officer waited over a month after plaintiff's claim to answer that "an investigation of the alleged changed conditions will be conducted by the Nashville District"; and the actual inquiry appears not to have been made until some two years later. Conversely, the record shows clearly that both the contractor's and the Government's agents were most anxious to proceed with the dewatering of the cofferdam so as to keep up with the schedule of performance. Dewatering could not be accomplished without stopping the return flow, through the use, in part, of the large-scale plugging measures plaintiff undertook. The defendant's own witness (Bowman, Tr. 122, 132) testified that during this period the plaintiff did what it should have been doing, without any complaints from Government representatives.

■ Finally, we come to the question of the support in the record for the Board's factual finding that no large cavern, crevice, channel, trench, hole or other opening has been proved. The standard under the Wunderlich Act, 41 U.S.C. § 321, is whether that finding is supported by substantial evidence in the record as a whole. Carlo Bianchi & Co. v. United States, Ct.Cl., No. 466–54, decided July 17, 1964, slip op., p. 3; Hoffman v. United States, Ct.Cl., 340 F.2d 645, decided May 15, 1964. Cf. Universal Camera Corp. v. NLRB, 340

U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). This requires consideration of the materials presented by both sides, and of cross-examination as well as direct. Hoffman v. United States, supra; Williams v. United States, 127 F.Supp. 617, 619, 130 Ct.Cl. 435, 441, cert. denied, 349 U.S. 938, 75 S.Ct. 783, 99 L.Ed. 1266 (1955). A scintilla is not sufficient, nor is it enough that some pieces of testimony, in isolation and by themselves, could be said to underpin the finding.

■ We have reviewed the evidence before the Board. Looking solely to that proffered on behalf of the Government, one might say that there was barely enough to sustain the administrative finding. However, when we weigh that evidence against the plaintiff's case and the cross-examination of defendant's witnesses, we are forced to decide that the Board's finding is not adequately supported in the record before it.

Four witnesses were present at the time of the gross inflowing leak in late July and early August 1954. Each indicated that there was a very considerable current of water flowing back into the cofferdam area, and that that current must have been connected with a sizeable opening leading from outside the cofferdam back into the area to be enclosed and dewatered. For the plaintiff, Gause, the diver who made an underwater investigation on August 2nd to discover the cause of the great resistance to pumping, testified in detail that he found a large cavern or crevice, lowered himself into it horizontally, and reported its existence topside; he also testified, specifically, that there was a flow of current coming from the bottom of the crevice. Mr. Mitchell, a supervisor for the contractor, testified that there was either a "large wide open channel" or "a deep, narrow trench" "in the bottom of the river"; that he personally probed from the surface into such a large opening; that he heard the diver's contempo-

---

9. This argument is not mentioned by the Board. It may also be precluded by the Board's (and the contracting officer's) consideration of the substance of the claim.

raneous description of the opening over the intercom; that there clearly was a strong current at the spot manifested by "boils" in the water, one inside and the other outside the cofferdam; and that it was necessary, in order to stop this leak, to take several remedial measures—including the saturation of that whole corner of the cofferdam with heavy black clay and the dumping of large amounts of sandbags and other material. For the defendant, Mr. Rochelle, the Government's foundation engineer, declared that he thought the two "boils" (inside and outside the cofferdam area) were connected and that it was evident that a water stream came "from a hole in the bottom of the river"; he also testified that there was a "tremendous flow of water here" and that until the clay blanket was put down there was no real progress in stopping the major leak at the general place where plaintiff claims the cavern to have been. Mr. Bowman, the Government's project engineer and its witness, testified that the two pertinent "boils" were "big enough to see"; he agreed that the "volume and force of the water coming through whatever it was coming through was of such force that it boiled up at least 15 or 20 feet from the bottom" and that "it was of such quantity that you couldn't pump it out with your two 10,000 gallon-a-minute pumps and four 3,000-gallon pumps." [10] He, too, testified that the "boils" were stopped by the clay blanket put down by plaintiff in the corner of the cofferdam area where it considered the large opening to be.

Added to this accord in all of the eye-witness testimony is the cardinal fact that an enormous amount of material was necessary to plug the leakage and allow the water in the cofferdam to be pumped out: clamshell loads of concrete; so many sandbags that, if they had not washed out, they would have protruded above fifteen feet of water; a

heavy layer of black clay all around that corner of the cofferdam; asphalt grouting; an earthen dyke; and steel pilings. If the opening in the river bed had been small (e. g., one foot), as defendant contends, these stringent measures would not all have been necessary. Nor would they have been necessary if the back-flow, at the time of pumping, had been less than very large and very forceful. From all of this evidence (and other items) we cannot escape the conclusion that there was in fact a crevice, channel, hole, trench, or opening; that it was considerable in size; and that a large volume of water flowed through it in force.

What is there on the Government's part? We put aside at once the argument that plaintiff has failed to prove its *precise* claim that the opening was 12' by 4' in size and that the flow was 32,000 gallons per minute. To show a "changed condition" plaintiff did not have to demonstrate an opening of that exact magnitude and just that flowage. It sufficed to prove a large opening—much larger than the one-foot crevice the Board seemed willing to assume—through which passed a very considerable stream. As we have pointed out, such an opening was not to be anticipated under the contract. If, as we find, the existence of a large water-bearing channel was conclusively proved, the plaintiff cannot be made to fail because it may not have succeeded in demonstrating that the channel was exactly of the size, shape, location, and character claimed at the Board hearing.

The residue of the defendant's case against the existence of a large water-bearing opening consists, essentially, of three items. One is that, after the cofferdam was wholly dewatered and cleared, the defendant's project engineer (Mr. Bowman) walked over the bed of the river and saw no signs of such an opening, although in his view there should have been tell-tale marks. In the light of the amount of material poured into

---

10. He added: "We started out with three 10-inch pumps and that didn't even touch it, and we got another 10-inch pump and couldn't see much difference, and then we got the two 20's, and I think, as I remember, they brought the water down to about six feet in one night, and that is as far as it would go  *  *  *."

the area, the continuing action and reaction of the water in the cofferdam, and the effects of the clearing and bulldozing operation, Mr. Bowman's observation does not seem extraordinary; in any event, this small piece of negative testimony is not a substantial counter-weight to the great body of evidence supporting plaintiff. Another item is a brief contemporaneous memorandum made by two Government inspectors who heard, over an intercom, the diver's oral report from the river-bed on August 2nd; this memorandum states that the diver reported "a major crevice 1 foot plus or minus in dimensions (width) adjacent and under diaphragm between D–5 and D–6. *Also a good leak at D–5*" (emphasis in original). This short description is ambiguous in that the "good leak at D–5" may refer to the larger opening plaintiff asserts; the one-foot crevice may have been only a part of that opening. In addition, this summary document, though contemporaneous, cannot out-balance either the detailed oral testimony of the eye-witnesses that there was, or must have been, a larger opening, or the undisputed physical facts showing the large amount and strong flowage of the water.[11]

Finally, the defendant and the Board say that the inflow could just as easily be attributed to plaintiff's faulty work on the cofferdam walls and to leakage from the nearby timber crib (for which plaintiff has already been paid). The main answer to this contention is that, as a physical fact, an inflow of the general strength, volume, and location demonstrated here could not have resulted from the series of leaks assigned by defendant to these other causes. At its full weight, defendant's evidence as to individual faults in the cofferdam walls or inadequate and incomplete grouting, taken together with the leakage from the timber crib, could not account for the particular phenomena—connected "boils" on both sides of the cofferdam wall; a strong current between the "boils"; great resistance to volume pumping; washing out of sandbags; need for an enormous amount of plugging material—which this record reveals without much dispute. Those phenomena, described by the witnesses who saw them, are explainable only by the existence of a "hole in the bottom of the river", as defendant's foundation engineer put it. Moreover, it seems clear on the record that, in large part, the claimed inadequacies in plaintiff's work and procedures (a) were cured before the trouble near cofferdam Cell D–5 became serious at the end of July and the beginning of August 1954; (b) were related to other areas not close to this particular corner of the cofferdam; or (c) cannot be directed against plaintiff's performance in that corner.[12]

We hold, for these reasons, that the Board's finding as to the non-existence of a large channel or opening is unsupported by substantial evidence in the record as a whole, and that the whole record requires the contrary finding.

The result is that plaintiff is entitled to recover an equitable adjustment for the increase in the cost and time of its performance due to this changed condition. Though the Board had some evi-

11. The two inspectors who authored this memorandum were not called as witnesses.
   The Board's opinion denigrates the diver's description of the size of the cavern by referring to his agreement, on cross-examination, with Government counsel's statement that a "notation written on the date of your dive would be more accurate than your memory of this, at this time." This colloquy had to do with the exact location of the cavern, not its dimensions; and what the witness responded was: "I think you would find that true in any instance, regardless, with any individual." In the circumstances, and in the light of the whole of the testimony by the eye-witnesses, this exchange should be given very little significance.

12. To the extent the Board may have inferred from the core borings (which showed cavities or openings of less than one foot) that a much larger opening could not have existed, it was obviously in error. See, also, supra, especially fn. 5.

dence before it bearing on the amount of recovery, it never reached that issue. Our trial commissioner made no finding on the amount of recovery, though he has reported that plaintiff spent $71,168.26. Under Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 162 Ct.Cl. 802 (1963), and succeeding decisions of the same type, we can and will remand the case to the trial commissioner for the determination of the amount, including any proper remission of penalties for late performance. That determination should not assess against the defendant those extra costs, if any, of dewatering the cofferdam, which are fairly attributable to causes other than the changed conditions—such as leaks in cofferdam walls or an inadequate or incomplete grouting program (including grouting which plaintiff expected to perform). Nor should the defendant be charged again for the leakage through the timber crib for which it has already paid.

The plaintiff is entitled to recover, and judgment is entered to that effect. The amount of recovery will be determined, in accordance with this opinion, under Rule 47(c).