**AL JOHNSON CONSTRUCTION CO., Plaintiff,**

v.

**MISSOURI PACIFIC RAILROAD COMPANY, Defendant.**

No. LR 72–C–80.

United States District Court,
E. D. Arkansas, W. D.

May 25, 1976.

Ronald D. Olson, Minneapolis, Minn., Leon B. Catlett, Little Rock, Ark., for plaintiff.

B. S. Clark, Little Rock, Ark., for defendant.

## MEMORANDUM OF DECISION AND ORDER

BENSON, District Judge.

### NATURE OF THE CASE

This diversity contract action was tried to the Court without a jury. The uncontroverted facts and the unresolved issues were stipulated by the parties as follows:

The Missouri Pacific Railroad, Defendant herein, entered into agreements with the United States of America covering the

alteration of the Missouri Pacific Railroad Companies Junction Bridge (Contract No. 62450) and the Baring Cross Bridge (Contacts No. 62855), both across the Arkansas River at Little Rock, Arkansas. Under these contracts, the Defendant was required to make the necessary alterations to the bridges and the United States of America was required to compensate Defendant for money expended in making the alterations.

After plans for the required work were completed, bids were taken for performing the substructure alterations necessary for the two bridges and for construction of a shoofly bridge (a temporary bridge) for use during the construction work. The Al Johnson Construction Company of Minneapolis, Minnesota (Plaintiff) was the successful bidder for this work and accordingly the railroad entered into an agreement with Plaintiff on June 5, 1968 (Contract 64444) to perform the necessary substructure work.

During the performance of this work, certain conditions were encountered that Plaintiff took exception to as being different from those shown in the plans and specifications. The Plaintiff filed with the Defendant the following claims for additional compensation. These claims are as follows:

1. Changed conditions at the South Pier, Junction Bridge—amount $257,000.00 —submitted November 3, 1969.

2. Changed conditions Shoofly Bridge— increased the driving and drilling costs—amount $40,000.00.

3. Changed conditions Baring Cross Bridge—driving and drilling 30 inch pipe piles through obstructions— amount $63,000.00—submitted January 5, 1970.

4. Change in the work—Baring Cross Bridge, Pier 6—explosives prohibited—amount $20,065.00—submitted February 17, 1971.

5. Changed conditions—Shoofly Bridge— Cofferdam required—amount $5,381.-70—submitted November 13, 1969.

The Plaintiff claims that it encountered Changed Conditions as contemplated in paragraph 8 of Special Conditions of the contract and that Changes in the work took place within the meaning of paragraph 43 of the General Provisions of the contract, in each of the claims stated above. Defendant denied that Changed Conditions existed within the meaning of the contract and that no Changes in the contract occurred in connection with the above mentioned claims.[1]

## FINDINGS

### A. GENERAL

The consulting engineers on the project, Sverdrup & Parcel and Associates, Inc., of St. Louis, Missouri (S & P), were retained by Defendant, Missouri Pacific Railroad Company, (MOPAC), in February, 1967, to perform engineering services including surveys, design, preparation of plans and specifications and contract documents, with estimates of quantities and costs. S & P was also retained by MOPAC under a separate contract to perform survey investigations which included core boring and seismic profiling. S & P also acquired and used boring data compiled by the United States Corps of Engineers (Corps), in 1964. In addition, S & P engaged EG & G International, (EG & G), to identify possible obstructions in the vicinity of Pier 5 of the Baring Cross Bridge. All of this information, with the exception of the EG & G report, was incorporated into the plans and specifications furnished to the bidders. The EG & G report was also furnished to prospective bidders. The invitation to bid was issued on May 1, 1968, and the bid opening was set for June 5, 1968. The bid of Plaintiff, Al Johnson Construction Co. of Minneapolis, Minnesota (Johnson Construction) was accepted and it was awarded the contract.

1. The evidence established that Claim 3 related to drilling for the Shoofly Bridge and not the Baring Cross Bridge as set out in the stipulation. Defendant contested validity of all of the claims except Claim 4. It did not contest the amount of any of the Claims except Claim 4.

Johnson Construction received the bid invitation and a copy of the plans and specifications and other information in early May, 1968. After studying the plans and specifications, and all other information provided by MOPAC, it made an on-site inspection on May 24 and 25, 1968. At that time, the river was running about ten feet higher than normal and the water was in a riled condition. Neither the logs nor the on-site inspection disclosed the existence of unusual subsurface conditions in the vicinity of the proposed construction.

Because of the short time interval between the invitation to bid and the bid opening and because of the high water level at that time of year, it was not possible for bidders to make their own subsurface exploration of site conditions prior to bidding, and MOPAC did not really expect that they would. In preparation of its bid, Johnson Construction relied on the subsurface information supplied to it by MOPAC. The contract clauses relevant to the issues in this case are found in the specifications and provide:

"GENERAL PROVISIONS.

"Article 7. *EXAMINATION OF PLANS, SPECIFICATIONS AND SITE OR WORK.* It shall be understood that the Contractor has, by careful examination, satisfied himself as to the nature and location of the work, the conformation of the ground, the character, quality and quantity of the materials to be encountered, the character of equipment and facilities needed preliminary to and during the prosecution of the work, the general and local conditions, and all other matters which can in any way effect the work under this Contract. . . ."

"Article 43. *CHANGES.* The Company shall have the right to make any changes that may be hereafter determined upon, in the nature or dimensions of the work, either before or after its commencement, and such changes shall in no way affect or void the obligations of this Contract. If such changes make any change in the cost of the work, an equitable adjustment

shall be made by the Chief Engineer to cover the same, but the Contractor shall not claim compensation for anticipated profits."

*SPECIAL CONDITIONS.*

"Article 6. *SUBSURFACE CONDITIONS.*

. . . . .

Certain boring information has been obtained for design purposes and the logs of borings are shown on the plans for the convenience of the Contractor and for such use, if any, as he may at his own risk desire to make of it. No representations or guarantees are made concerning the completeness of the boring data. Such data indicates an opinion as to materials encountered at the specification location of the respective borings and may not represent materials which will actually be encountered in performing the work.

. . .

The Contractor shall also be informed that an older bridge stood on the site of the present Baring Cross Bridge. During the flood of April 21, 1927, portions of the bridge collapsed carrying 14 coal cars and about 750 tons of coal into the channel of the river. One of the piers destroyed in this flood was located approximately at the site of new Pier 5 to be constructed under this contract. Available records do not indicate if any of the equipment was recovered or if any of the original substructure was removed from the river."

"Article 7. *SUBSURFACE INVESTIGATION (BARING CROSS BRIDGE).* In further connection with the provisions and information set out in Art. 6 next above, entitled SUBSURFACE CONDITIONS, the services of an independent agency were retained to conduct a marine seismic profiling survey and to prepare a report of the findings along the construction alignment of the Baring Cross Bridge, more particularly in the vicinity of the proposed site of new Pier 5. The results of this survey, which was completed in January, 1968, are set forth in the Technical Report Number B–3726 entitled 'Subsurface Investigation—Baring

Cross Bridge over Arkansas River' prepared by EG & G International, Inc. This report is not to be issued to bidders, but shall be considered a contract document supplemental to the plans and these specifications in the same manner as if actually included and attached hereto. The report is available, however, to all interested parties for personal examination by contacting Sverdrup & Parcel and Associates, Inc. in St. Louis or the contracting department of the Company, also in St. Louis.

The purpose of the above report was to more clearly define the presence, if any, of debris which may be obstructive to construction, principally for the base of Pier 5. Any conclusions reached from the report shall be a matter of individual interpretation. The overall geological study of subsurface conditions, however, are complemented further with a concentrated probing program conducted during subsurface investigations, the results of which are depicted and tabulated on Sheet 5 of the plans.

The above mentioned profiling survey and the results of the probing program shall be considered the best information the Company has available with respect to subsurface conditions at the location in question."

"Article 8. *CHANGED CONDITIONS.* As the various portions of the subsurface are penetrated during the work, the Contractor shall, promptly and before such conditions are disturbed, notify the Engineer at the project site and Company in writing if the actual conditions differ substantially from those which were indicated or normally inherent in the nature of the work or if obstructions obviously foreign to the natural character of the substratum or previously unknown obstructions are encountered. If in concurrence therewith the Engineer at the site will promptly submit to the Contractor a plan or description of the modifications which he proposes should be made in the contract documents. The resulting increase or decrease in the contract price or time allowed for the completion of the

contract shall be estimated by the Contractor and submitted to the Engineer at the site in the form of a proposal. . . ."

## B. CLAIM 1—SOUTH PIER JUNCTION BRIDGE.

On or about August 17, 1968, Johnson Construction, while taking jet probings at the South Pier site in connection with preparation for construction of the pier, discovered a hard rock ledge jutting out from the riverbank and underlying the river, which was not shown on the contract documents, plans, specifications or borings, and which would require a different and more costly method of construction than had been contemplated by either MOPAC or Johnson Construction.

At a meeting on August 21, 1968, the discovery was disclosed to MOPAC officers. It was agreed that a large portion of the ledge would have to be removed in order to install the pier. The specifications required the pier be constructed "in the dry". To remove the ledge and meet the "dry" requirement, Johnson Construction recommended the use of a cellular cofferdam method. MOPAC asked for plans and cost estimates on this recommended method. Johnson Construction proceeded to work on the project and submitted the revised plans and cost estimates on October 5, 1968. On December 20, 1968, MOPAC indicated it had no objection to the use of the cellular cofferdam but could assume no obligation for increase in construction costs. MOPAC forwarded Johnson Construction's cost estimates and plans to the Corps, and in its transmittal letter stated:

"At the site for the South Pier, we have encountered rock lying differently than our construction plans indicated. The rock is lying in such a way that the caisson method of construction could not be used without considerable change to the rock by blasting and leveling. Also, the open dredged cofferdam method of construction could not be utilized since it would be extremely difficult to build these cofferdams on the rock tight enough for pouring concrete in the dry.

As a result of these changed conditions, the contractor has proposed to construct the South Pier in an open cellular cofferdam.

. . . . .

We agree that due to the position of the rock at the site, a cellular cofferdam appears to be the most expedient method of building the pier."

The Court finds the presence of the rock ledge was unknown and was a condition materially and substantially different from conditions disclosed by MOPAC's plans, specifications and borings. On January 29, 1970, Johnson Construction submitted a claim for $256,988.00 for increased compensation under the Changed Conditions clause of the contract.. The Court further finds such sum to be a reasonable and necessary increased cost required to construct the South Pier, caused by the presence of the rock ledge.

## C. CLAIM 2—INCREASED DRILLING COSTS, SHOOFLY BRIDGE.

■ The plans and specifications furnished Johnson Construction prior to bidding, for use in bidding, indicated ten core borings had been drilled in the vicinity of the Shoofly Bridge. All but one of the borings indicated gray to black shale in the soft to moderately hard range. The one boring indicated a line of hard black sandstone.

In the construction of the bridge, Johnson Construction's drilling operations from Bent 6 through Bent 12[2] encountered layers of milky white vein quartz, brecciated wall zone quartz, and layers of light to dark gray quartzitic sandstone, varying in degrees from several inches to several feet. These were hard rock formations and resulted in greatly increased drilling time for 79 of the 124 piles; caused extensive wear on the drilling bits; and created unexpected difficulties in properly seating pipe pile into the rock.

The Court finds the layers of hard rock formations were conditions substantially different from those which were indicated by the borings MOPAC furnished to Johnson Construction and relied on by Johnson Construction. MOPAC was advised of the situation, and Johnson Construction, on January 8, 1970, submitted a claim for $40,-494.40 under the Changed Conditions clause of the contract for increased compensation. The Court further finds such sum to be a reasonable and necessary increased drilling cost required by reason of the rock formation.

## D. CLAIM 3—DRIVING AND DRILLING THIRTY INCH PIPE PILES THROUGH OBSTRUCTIONS— SHOOFLY BRIDGE.

■ The Shoofly substructure required pipe piles of 30 inch diameter. In driving seven of those pilings, foreign materials were encountered, which necessitated pulling and re-driving the pilings. The cutting shoes on the pulled pilings were damaged and it was determined that the damage was caused by having struck steel. Such steel obstructions were obviously foreign to the natural character of the substratum.

The Junction Bridge and the Baring Cross Bridge were situated about one-half mile apart, and the Shoofly Bridge was designed to be constructed roughly midway between the two bridges.

Article 6 of the Special Conditions as previously noted, informed the contractor of the collapse of a portion of a pier at the Baring Cross Bridge site in 1927 carrying 14 coal cars into the river channel, and that one of the destroyed piers of the old bridge was located at approximately the site of the new Pier 5 of Baring Cross Bridge to be constructed under the contract.

The EG & G survey report along the construction alignment of the Baring Cross Bridge did not disclose any specific debris in the area of the survey. In bidding, Johnson Construction put in a contingency sum to cover the anticipated problem at the Pier 5

2. A bent is another name for a pile footing.

site, but did not bid a contingency for possible obstructions at the Shoofly site, because the core borings furnished the bidders did not disclose the presence of any foreign materials at the location of the Shoofly Bridge.

On January 5, 1970, Johnson Construction submitted a claim for $63,583.62 under the Changed Conditions Clause of the contract for increased compensation. The Court finds such sum to be a reasonable and necessary increased drilling cost required by reason of obstructions foreign to the natural character of the substratum.

### E. CLAIM 4—WORK CHANGE—BARING CROSS BRIDGE, PIER 6.

■ Article 57 of the General Provisions of the specifications permitted the contractor the use of explosives in excavating, subject to certain limitations not relevant to this claim. Prior to the commencement of the required excavation at Pier 6 of the Baring Cross Bridge, Johnson Construction was directed not to use explosives at that location. This resulted in the necessary excavation by hand methods of approximately 13 feet of solid shale, which entailed increased costs. In preparing its bid, Johnson Construction, in reliance on the specifications, had intended to excavate at that point by blasting. The change here was a General Provision, Article 43, change which entitled the Plaintiff to an adjustment.

On February 17, 1971, Johnson Construction submitted a claim for $20,065.90. Defendant, without adequate explanation, failed to act on the claim. At trial, Defendant admitted the validity of the claim but questioned the amount. The evidence is sufficient to support the claim in the amount as rendered, which the Court finds to be a necessary and reasonable increased cost required by reason of the change ordered by MOPAC.

### F. CLAIM 5—BENT 21 COFFERDAM, SHOOFLY BRIDGE.

■ The plans for construction of Bent 21 required excavation to a design elevation of 230.56 feet, which was a relatively shallow excavation and would have enabled the contractor to construct the concrete footings in the "dry" through the use of sandbags to keep out the water. After construction commenced, probings indicated the level of solid rock to be lower than that shown by the plans. As a result, the actual excavation required of Johnson Construction by MOPAC engineers was 3.06 feet below the elevation shown in the contract specifications. Sandbags could not control the water at the lower foundation grade and it was necessary to construct a steel cofferdam. A claim for increased compensation was submitted on November 3, 1969. The sum of $5,381.70, being the cost of the cofferdam, was disallowed. The Court finds the actual subsurface conditions differed substantially from the conditions shown on the plans and required the building of a cofferdam which would not have been necessary if the conditions had been as represented in the plans. The Court further finds the sum of $5,381.70 to be a reasonable and necessary increased cost required by reason of the Changed Conditions.

### CONCLUSIONS

The Court concludes that Plaintiff Al Johnson Construction Co. is entitled to an equitable adjustment on each of its claims, and is entitled to recover from Missouri Pacific Railroad Company as follows:

On Claim 1, $256,988.00
On Claim 2, $ 40,000.00
On Claim 3, $ 63,000.00
On Claim 4, $ 20,065.90
On Claim 5, $  5,381.70

together with interest on each claim at the legal rate, commencing sixty days after the claim was submitted.[3]

---

**3.** The claims were pleaded in separate causes of action. The sixth cause of action related to $5,000.00 retainage which Defendant admitted and indicated would be paid. On the assumption that it will be paid, this claim will not be included in the order for judgment. Plaintiff proved increased costs of $40,494.40 on Claim 2, but pleaded only $40,000.00. Likewise, on Claim 3, Plaintiff proved increased costs of $63,583.62, but pleaded only $63,000.00.

## RATIONALE

■ The central issue before the Court on four of the Plaintiff's causes of actions (Claims) is the proper interpretation and application of the "Changed Conditions" Clause of the contract found under SPE-CIAL CONDITIONS, Article 8, of the specifications. It is the Defendant's position that the clause is not applicable because of the disclaimers found in General and Special Conditions of the specifications, and because of the duty of the contractor to make its own investigation of subsurface conditions.

It is noted the invitation to bid contained the following language:

"Close scheduling of construction and completion of various phases of the work under this contract will be required in order to meet overall construction schedules and to complete alterations to the entitled structures with the least amount of interference to railroad traffic."

Close scheduling appears to have been a characteristic feature of the entire project, commencing with the letting of bids. A substantial part of the work to be performed related to the subsurface of the Arkansas River. Prospective bidders received their invitation to bid and plans and specifications in early May of 1968, with bid opening set for June 5, 1968. This was at a time when the river was running at least 10 feet higher than normal. Boring and seismic information relating to the subsurface conditions of the river at the points to be subjected to construction activity was furnished to the bidders with a disclaimer that it was ". . . for the convenience of the Contractor and for such use, if any, as he may at his own risk desire to make of it. No representations or guarantees are made concerning the completeness of the boring data. Such data indicates an opinion as to materials encountered at the specific location of the respective borings and may not represent materials which will actually be encountered in performing the work."

At the trial, it became readily apparent to the Court that in this case the disclaimers were in fact nothing more than prudent language which engineers would be expected to include in their specifications, and in reality, MOPAC, its consulting engineers, and the Corps, expected the actual conditions to be substantially as represented by the plans, specifications, coring logs and seismic survey furnished to the bidders. Further, in view of the abnormal height of the river during the time of bidding and the relatively short time MOPAC allowed for the preparation of bids, it did not expect any of the bidders would make their own borings and subsurface survey.

It would have been virtually impossible for any bidder to make its own borings, analyze them, compute, prepare, and submit its bid in the time allowed. Under such circumstances, the disclaimers could only be binding against the Contractor on variations in conditions that were of a minor or non-substantial nature and which a contractor could reasonably have been expected to foresee and allow for in the preparation of its bid.

■ The Changed Conditions Clause must be given effect in this case because the actual conditions encountered, and which are the basis of four claims, differed substantially from those which were indicated and on which the contractor was entitled and expected to rely. This is in accordance with well established law. See, Centex Const. Co., Inc. v. James, 374 F.2d 921, 924 (8th Cir. 1967); Wunderlich Contracting Co. v. U. S., 240 F.2d 201, 205 (9th Cir. 1957) cert. denied 353 U.S. 950, 77 S.Ct. 861, 1 L.Ed.2d 859 (1957).

By giving effect to the Changed Conditions Clause, it thereby serves the purpose for which it was designed, as expressed by the Court of Claims in Foster Construction Co., et al. v. United States, 435 F.2d 873, 193 Ct.Cl. 587 (1970):

"The starting point of the policy expressed in the changed conditions clause is the great risk, for bidders on construction projects, of adverse subsurface conditions: 'no one can ever know with certainty what will be found during subsurface operations.' Kaiser Industries Corp. v. United States, supra, 340 F.2d [322] at

329, 169 Ct.Cl. [310] at 323. Whenever dependable information on the subsurface is unavailable, bidders will make their own borings, or more likely include in their bids a contingency element to cover the risk. Either alternative inflates the costs to the Government. The Government therefore, often makes such borings and provides them for the use of the bidders, as part of a contract containing the standard changed conditions clause. Bidders are thereby given information on which they may rely in making their bids, and are at the same time promised an equitable adjustment under the changed conditions clause, if subsurface conditions turn out to be materially different than those indicated in the logs. The two elements work together; the presence of the changed conditions clause works to reassure bidder that they may confidently rely on the logs and need not include a contingency element in their bids. Reliance is affirmatively desired by the Government, for if bidders feel they cannot rely, they will revert to the practice of increasing their bids.

The purpose of the changed conditions clause is thus to take at least some of the gamble on subsurface conditions out of the bidding. Bidders need not weigh the cost and ease of making their own borings against the risk of encountering an adverse subsurface, and they need not consider how large a contingency should be added to the bid to cover the risk. They will have no windfalls and no disasters. The Government benefits from more accurate bidding, without inflation for risks which may not eventuate. It pays for difficult subsurface work only when it is encountered and was not indicated in the logs.

All this is long-standing, deliberately adopted procurement policy, expressed in the standard mandatory changed conditions clause and enforced by the courts and the administration of authorities on many occasions. (citations omitted). Faithful execution of the policy requires that the promise in the changed conditions clause not be frustrated by an expansive concept of the duty of bidders to investigate the site. That duty, if not carefully limited, could force bidders to rely on their own investigations, lessen their reliance on logs in the contract and reintroduce the practice sought to be eradicated—the computation of bids on the basis of the bidders' own investigations, with contingency elements often substituting for investigation. The changed conditions clause 'makes it clear that bidders are to compute their bids, not upon the basis of their own preaward surveys or investigations, but upon the basis of what is indicated and shown in the specifications and on the drawings.' *A. S. Horner Constr. Co., supra,* 59–2BCA at p. 10,577. The clause 'should induce the bidder not to consider such contingencies' as the latent or subsurface conditions, for which the Government has assumed responsibility. *Kendall, Changed Conditions as Misrepresentation in Government Construction Contracts, supra,* 35 Geo.Wash.L.Rev. at 985. As a complement to the changed conditions clause, therefore, the standard Instructions to Bidders, in clause 2 (test in appendix), requires bidders only to ascertain such conditions as may be 'readily determined by inspection and inquiry, such as the location, accessibility and general character of the site.' " 435 F.2d at 887, 888.

*See also, Farnsworth & Chambers Co. v. United States,* 171 Ct.Cl. 30, 346 F.2d 577 (Ct.Cl.1965); *Morrison Knudsen Company v. United States,* 170 Ct.Cl. 712, 345 F.2d 535 (Ct.Cl.1965); *Fehlhaber Corporation v. United States,* 138 Ct.Cl. 571, 151 F.Supp. 817 (Ct.Cl.1957) *cert. denied* 355 U.S. 877, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957).

Defendant's position on each of the claims is deserving of comment. The rock ledge which was the changed condition and the basis for Plaintiff's $257,000 South Pier Junction Bridge claim was so obviously a changed condition it could scarcely be contested. However, the changed condition mandated a different method of pier construction than previously contemplated by

either MOPAC or Johnson Construction. The cellular cofferdam method selected by the contractor was neither approved nor disapproved by MOPAC and the Corps, but it was conceded by MOPAC to be the most feasible. Defendant built its defense around Johnson Construction Co.'s selection of this particular type of cofferdam, but under the circumstances, it had little to support its defense of the claim.

Defendant built its defense on Claim 2 around the notation on Sheet 2 of general description of rock types in the area, which described the quartzitic sandstone that was encountered. Further, Defendant contended drilling time shown on those logs should have alerted Plaintiff to the hard matter. The fact is the borings furnished Plaintiff for its use and on which Plaintiff relied, showed rock different than the rock encountered. On the Court's finding that under the circumstances of this project it was not intended or expected the bidders would explore the area by borings of their own, Plaintiff had the right to rely on information furnished to it, and on the "Changed Conditions" clause of the contract.

Claim 3 was defended on the basis that Special Conditions, Article 6, advised the bidder of the collapse of a bridge forty years earlier and alerted bidders to the possibility that obstructions foreign to the natural character of the substratum may be present. The evidence established Plaintiff relied on the boring logs, and the separate survey furnished it which failed to show any of the foreign obstructions subsequently encountered at the site of the Shoofly Bridge, except one ⅝ inch bolt. Again, in reliance on the "Changed Conditions" clause, nothing was included in the bid to cover the contingency. A relatively small contingency item, $21,000.00, was included on new Pier 5, Baring Cross Bridge, which was disclosed on the specifications to be the location where the old pier had collapsed. No claim has been made for additional compensation on Pier 5.

Claim 4 arose from changes directed in the method of excavating at Pier 6 of the Baring Cross Bridge. Defendant admitted the change was directed, but questioned the method of computation. Defendant's theory of computation is not supported by the evidence in the record.

The only disagreement on Claim 5 was whether Plaintiff should be paid for the cost of the cofferdam required by reason of the "Changed Condition". Defendant relies on Section 4, Paragraph 11, of the specifications which provides that payment for excavation includes the cofferdam. When the "Changed Condition" required a cofferdam that would not have been required under the plans and specifications, as bid, the contractor should be paid for it as the cost of it would obviously not have been included in the bid.

Johnson Construction sued for an equitable adjustment in compensation. The evidence at trial revealed the Plaintiff to be a highly competent and efficient construction company. Of significance in that regard is the fact that no serious issue arose between trial counsel as to the reasonableness of the sums claimed. The case was defended solely on the issue of contract interpretation. The adjustment now ordered is justified both as a matter of law and equity.

### ORDER FOR JUDGMENT

IT IS ORDERED that judgment be entered for the recovery by Al Johnson Construction Co. from Missouri Pacific Railroad Company the sum of $385,435.60, together with interest at the legal rate, as additional compensation for construction of alterations to Baring Cross Bridge No. 3451 and Junction Bridge No. 3452 over the Arkansas River at Little Rock, Arkansas, Substructure and Shoofly.