M.C. ANDERSON, d/b/a M.C. Anderson
Construction Company, Plaintiff,

v.

Donald GOLDEN, Defendant.

CV481–237.

United States District Court,
S.D. Georgia,
Savannah Division.

Dec. 28, 1982.

Stanley E. Harris, Jr., Savannah, Ga., for plaintiff.

Robert J. Campbell, Kansas City, Mo., and Aaron L. Buchsbaum, Savannah, Ga., for defendant.

## ORDER

EDENFIELD, District Judge.

The above-captioned case came on for bench trial before this Court on August 24, 1982. After hearing three days of testimony and reviewing numerous exhibits and depositions, the Court now makes the following Findings of Fact and Conclusions of Law.

### Introduction

This suit involves a classic confrontation between the developer of a project, McAlpin Square Shopping Center, and his contractor, in this case, the rough-grading and storm drainage system contractor. The conflict which arose during the course of the work was exacerbated by the weather and other adverse conditions at the site of the development. Each party accused the other of various breaches of the contract. The contractor, M.C. Anderson, doing business as M.C. Anderson Construction Company, filed a materialmen's lien against the McAlpin Square property. He subsequently brought this action, which was removed to this Court on the basis of diversity jurisdiction, against Donald Golden, the developer of McAlpin Square. He seeks monies allegedly due under the contract, remuneration in quantum meruit, reimbursement of certain funds expended during the course of the job, and attorney's fees. Golden, in turn, asserted a counterclaim for delay damages, for the cost of correcting or completing work under Anderson's contract, for expenses incurred, and for slander of title.

### FINDINGS OF FACT

#### I. The Parties and the Contract

1. Plaintiff, an earthwork contractor, entered a lump sum contract to perform site work at the proposed McAlpin Square Shopping Center, with Donald Golden, a real estate developer with a leasehold in the property. The site is located in Chatham County, Georgia, northwest of the intersection of Victory Drive and Wallin Street.

2. Anderson received an invitation to bid on the development in late May, 1979. In order to prepare bids on the site grading and storm sewer construction work, prospective bidders were provided with a package of information prepared by Golden's architect, John Carey. The package included a bound book entitled "Specifications for Site Grading and Storm Sewer Work for the McAlpin Square Shopping Center" which contained detailed bidding and soil

boring information and a site grading plan dated May 23, 1979. The scope of the site work initially included clearing the site, raising it to the required elevation, rough-grading, and general preparation of building pad and parking area sites. Bidders were instructed to carefully examine the site, the drawings, and other bid documents and to verify conditions and locations in the field.

3. Anderson, the only earthwork contractor to bid the job, submitted a bid of $575,695.00 on June 12, 1979. In order to achieve a reduction in this price, John Carey engaged in discussions with Steve Chavis, Anderson's employee in charge of the McAlpin Square bid. After the elimination of a soil stabilization mat and the addition of a provision requiring the excavation of fill from retention areas adjacent to the site, Anderson submitted a revised bid of $425,-000.00 on June 21, 1979. After further discussions and negotiation, Anderson submitted a final proposal on August 15, 1979, for $425,000.00, which was substantially similar to the June 21, 1979 bid. Golden accepted this bid and after adding $4,250.00 for the bond premium, the contract price was $429,500.00.

4. Prior to the execution of the contract, Carey issued a revised grading plan dated August 23, 1979, which superceded the May 23rd plan. In addition to other minor configuration changes, the dimensions of easements in the retention pond area, which had been inadvertently omitted on the May 23rd drawings, were shown.

5. Anderson and Golden executed the standard AIA contract on September 12, 1979. The contract documents included the Owner-Contractor Agreement, the August 23rd drawings, the Specifications, the Instructions to Bidders, the Uniform Proposals, Addendum No. 1 (Post-Bid), and the General and Supplemental General Conditions. The contract contained a merger clause. Pertinent portions or paraphrases of portions of the contract documents are set out below.

a) The Agreement

Art. 2. The Contractor shall furnish all supervision, labor, materials, equipment, transportation and supplies necessary to perform the site grading work and storm sewer work for the Project.

Notwithstanding anything set forth in the contract documents to the contrary, Contractor acknowledges and agrees that Contractor has investigated soil and subsoil conditions of the site to its full and complete satisfaction.

Art. 3. Work to be commenced as soon as possible and substantial completion to be achieved according to terms of Schedule A.

Art. 6. Final payment when work completed, contract performed and final Certification for Payment issued by architect.

b) Schedule A

(1) Building pads for Units A & C to be completed by November 1, 1979. The remainder of the building pad areas by December 1, 1979. All remaining work by February 1, 1980.

Time is of the essence of this Agreement.

Without limiting the provisions of the preceding sentence, Contractor also agrees to complete the work as rapidly as field conditions permit ... so as to enable the Contractor to complete the work within the time limits specified above.

c) General Conditions

Art. 1.2.2. By executing the Contract, the Contractor represents that he has visited the site, familiarized himself with the local conditions under which the work is to be performed, and correlated his observations with the requirements of the Contract documents.

1.2.3. The Contract documents are complementary, and what is required by anyone shall be as binding as if required by all.

2.2.2. Architect shall have no authority to execute Change Orders.

2.2.3. The architect will visit the site at intervals appropriate to the stage of construction to familiarize himself generally

with the progress and quality of the work. . . .

2.2.17. If the owner and architect agree, the architect will provide one or more Project Representatives.

4.2.1. The Contractor shall carefully study and compare the Contract Documents and shall at once report in writing to the architect any error, inconsistency or omission he may discover.

4.3.1. Contractor . . . shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the work under the Contract. If Contractor shall have knowledge of same, he shall notify owner and architect of any actual impending or probable shortages of labor or material or of other factors which may affect adherence to the progress schedule.

6.1.3. The owner will provide for the coordination of the work of his own force and of each contractor with the work of the Contractor, who shall cooperate therewith as provided in Paragraph 6.2.

8.1.3. The date of substantial completion of the work or designated portion thereof is the date certified by the architect when construction is sufficiently complete, in accordance with the contract documents, so the owner can occupy or utilize the work or designated portion thereof for the use for which it is intended.

8.2.2. Three-day notice of delay from act, neglect or default of architect, owner, contractors, fire, stopping of work. If no claim for extension made within three days of occurrence, no claim for extension may be made.

12.3.1. If the Contractor wishes to make a claim for an increase in the Contract sum, he shall give the architect written notice thereof within 20 days after the occurrence of the event giving rise to such claim . . . before proceeding to execute work.

d) Uniform Proposal

Scope of work. "Bidder" . . . has become familiar with the general requirements and local conditions affecting the costs relating to this proposed project.

UP–4. No change in the work which affects the Contract price shall be implemented by the Contractor.

e) Specifications

Art. 10.9. Bidders are advised that the time element for the completion of the job will be one of the major considerations in awarding the contract. The Contractor, however, should estimate his time accurately as he will be required to meet his time schedule.

f) Supplementary General Conditions

0201b. Before submitting a proposal, bidders, general contractor and all subcontractors shall carefully examine the drawings and specifications, and fully inform themselves as to all existing conditions.

0202. Contractor's Responsibility

a. Site Inspection: The site where the work is to be constructed shall be carefully examined, the drawings and specifications read, and the Contractor shall thoroughly understand all requirements before work is begun. All existing ground elevations, utilities, soil conditions, etc., as shown on the drawings are as reported to the architect by others and are therefore not guaranteed correct. The Contractor shall verify all conditions and locations in the field and accept same unless he shall report any discrepancy to the architect prior to submitting his bid.

0217. Pay Requests

After the first monthly pay request each subsequent request shall be accompanied by a waiver of lien, signed by the General Contractor, covering the full amount of all payments received as of that date.

0304d. The fill shall consist of sandy clay, or other granular nonexpandable material of law plasticity, hauled in if necessary.

0305. Retention and Borrow Pit Areas

As long as Contractor excavates the retention areas to the elevations noted on the

plan, he may acquire additional fill from offsite if he so chooses.

0310. Sub-surface Investigation Report

A complete copy of the sub-surface investigation report is included for the Contractor's use and guidance. Any unusual condition found shall be brought to the attention of the architect before *proceeding with the work.*

g) Addendum No. 1 (Post Bid)

The following revisions and clarifications shall be made to the drawings and specifications, dated May 23, 1979.

8.e. Excavate borrow material from adjacent retention pond areas.

8.g. The maximum elevation in the retention basin shall be left at El. 1'.

6. The job which Anderson finally contracted to perform was essentially two-faceted:

(1) Clear, fill, and rough-grade the site

(2) Excavate retention ponds to a maximum of one foot above sea level elevation.

At the time of his final proposal, Anderson apparently contemplated a balance job. Chavis had estimated that to reach the finished grade levels, 114,000 cubic yards of fill would have to be placed on the site. Excavation of the fill from the borrow pits would, in turn, leave the retention ponds at a maximum elevation of plus one, after the unsuitable soil (overburden) was replaced in the bottom of the pits. The reduced figure of the final proposed price was based in part on the availability of on-site fill. Both Anderson and Chavis understood, however, that the contract required M.C. Anderson Construction Company to meet the final contours whether the amount of fill exceeded or fell short of the quantity Chavis had estimated would be needed.

7. The soils engineer's report contained in the specifications stated that the larger borrow area (Pit A) contained 18 feet of good usable fill overlain by an average of 7 feet of overburden. This amounted to 29,000 cubic yards of fill per acre. There were 6.67 acres, exclusive of the easements; thus, approximately 190,000 cubic yards of fill would be available for use from Pit A. Hussey and Gay, a civil engineering firm, later estimated the quantity of usable fill as approximately 112,000 cubic yards. Both Whitaker Laboratory, Inc. and D.E. Hill Engineers, who investigated the subsurface conditions, noted that the soil was slow-draining and that the site was normally wet.

Chavis noted that the area "was sort of a wet site" (Chavis Deposition at 43) when he walked the perimeter of the site. He did not further inspect the interior of the site because, according to Chavis, he was hindered by the dense undergrowth which covered it.

8. After discussing with Golden and Carey the timetable for completion, Chavis arrived at a schedule which was incorporated into the contract. (Schedule A). Despite the report on the condition of the soil, his own observation that the site was wet and his general awareness of the weather during the winter months, Chavis based the dates for completion on off-site material quality and ideal conditions. At trial, Anderson argued that the proviso attached to Schedule A that the "Contractor . . . agrees to complete the work as rapidly as field conditions permit" amended the timetable to allow additional time in the event of adverse conditions. Both the context and the wording of the proviso unambiguously demonstrate, however, that the preceding paragraphs setting forth the timetables contained *outside* dates for completion and that the proviso was intended only to underline the essential nature of timely completion.

Anderson did not meet any of the Schedule A deadlines for completion.

## II. The Work, The Delays, and The Disputes

9. Anderson and Golden executed the contract on September 12, 1979. Anderson's crew, with Chavis in charge, began work during the week of September 15th. Shortly after the work had begun, Carey, at Golden's request, wrote a letter to Chavis

concerning Item 8(e) of Addendum No. 1, which specified that borrow material was to be excavated from the adjacent retention pond areas. That item, Carey explained, was "more restrictive than intended," (D–15):

> You may ... secure fill material from offsite sources if you wish as long as it is acceptable material, the retention area is lowered to at least elevation 1' and the finished site is left at the new grades shown on the plans.

■ 10. From the outset, Anderson's crew encountered difficulties on the site. The primary problem was the high moisture content of the soil. Before borrow material could be placed on the site, the soil had to be dried through stockpiling and aeration, processes which slowed the progress of the work. Beginning in November and continuing through Spring, 1980, unusually frequent rains occurred, aggravating the moisture problem. Because the rain saturated the site, work was hindered on clear days. Anderson submitted two requests for extensions of time, the first on December 14, 1979, detailing 37 days lost to rain, and the second on February 8, 1980, (36 days lost). Anderson claimed a total loss of 52 working days to rain, 10 days for drying and stockpiling material, and 11 days for mucking and backfilling. The contract contained a three-day notice requirement for extensions but weather-related delays were inadvertently omitted from the language of the provision. It is undisputed that Anderson did not comply with the three-day notice provision.[1]

11. Some additional delay was experienced due to the absence of a local project representative empowered to resolve disputes and render interpretive decisions contemporaneously with the emergence of problems on the site. The general conditions provided that "[i]f the Owner and Architect agree, the Architect will provide one or more Project Representatives to assist the Architect in carrying out his responsibilities at the site." The Agreement entered by Golden and Carey provided that the owner and architect would nominate a project representative for the project. Carey testified that a project representative was appointed for the general contractor's portion of the work but that none was named for Anderson's contract.

The Owner-Contractor Agreement denominated the architect the owner's representative and required him to make periodic visits to the site. He was not required to be continuously present on the site. The architect was authorized to render necessary interpretations for the progress of the work upon written request by either the owner or the contractor and to order minor changes in the work which would not involve an adjustment in the contract sum or an extension of the dates for completion. Only the owner, however, could institute change orders.

Because no onsite project representative was present at the development site, Chavis was required to engage in time-consuming, long distance correspondence in order to obtain approval for proposed procedures. Delays resulted because of the circuitous route such communications had to follow.

However, a soil technician, either an employee of Whitaker Laboratory, Inc. or Joe Whitaker himself, was present on the site to advise Chavis on soil-related problems. Roy Hussey supervised the storm drainage system work. Golden's failure to appoint a project coordinator after the general contractor, McDevitt & Street, came on the job in early 1980 is completely understandable since Anderson had been expected to complete his portion of the work by February, and thereafter Golden continued to expect expeditious completion of the job. Moreover, both Anderson and McDevitt & Street assured Carey that they would coordinate their work and that it would be unnecessary to assign Anderson's contract to McDevitt & Street for coordination purposes.

---

1. The failure to comply with the three-day notice requirement for time extensions could not constitute a bar to the granting of such extensions since, for whatever reason, the parties did not include weather-related delays in the notice provision.

▆ Thus, the failure to name a project representative during the course of Anderson's work, particularly in view of the fact that a project representative could only have referred to the architect's somewhat limited authority, does not constitute a material breach of the Owner-Architect Agreement and does not breach the Owner-Contractor Agreement at all. The omission did contribute to Anderson's failure to timely complete the work.

12. In December, 1979, while excavating fill from Pit A, Anderson's crew encountered a utility line and damaged a sewerage pipe. Work was delayed while the sanitary sewerage was cleaned up and a rerouting structure erected. Because of the presence of the sewerage and utility lines, fill could not be excavated from that area and the quantity of fill available from the retention basin was reduced. Chavis claimed that he was unaware of the easements and utility lines therein because Carey's plans did not disclose their existence. The easements did not appear on the May 23rd plans because the easement information was not significant in May of 1979 since the specifications contemplated using offsite fill and there was no clear requirement for a retention area. The dimensions of the easements were added to the August 23rd drawings and the contractor was warned that the easements were to remain "undisturbed." The presence of utility lines within the easements was not disclosed though Carey and his assistant had in their possession topographic maps showing the easements and utility lines. After sending the August 23rd drawings to Chavis, Carey attempted to bring the easements to Chavis' attention by phone conversation and correspondence but Chavis misconstrued his reference to "easements" and interpreted Carey's remarks as references to the storm drainage system to be constructed.

▆ Though the easements were not otherwise pointed out to Chavis, the inset drawing on the August 23rd plan delineating the easements, along with the admonition that these areas were not to be disturbed by the contractor, would have given ample notice of the existence of the easements which were not to be excavated had Chavis or another Anderson employee studied the August 23rd drawings. Chavis testified that he did not learn of the presence of the easements and utility lines until the lines were exposed during excavation. Only at that point did he look at the August 23rd drawings and notice the easements and the qualifying remark. Hence, any allegations that the drawings were deficient in failing to give notice of the easements and that the plaintiff was therefore unable to accurately estimate the amount of available onsite fill is clearly meritless.

13. During the course of the work, there were five written change orders instituted as provided in the contract which increased the contract sum from $429,500.00 to $464,953.50.

a) Change Order No. 1, dated September 27, 1979, for $16,562.00 was for additional fill material to raise the finished grade level six inches.

b) Change Order No. 2, dated October 30, 1979, was for $9,525. Replacement of unsuitable material excavated from the retention basin comprised $7,525. Because of the high moisture content of the natural soil, the building pad for Unit C could not be proofrolled in order to ascertain whether soil needed to be replaced. The soil technician on the site recommended using an initial layer of offsite fill as a bridging lift to alleviate this problem. Chavis followed his advice and requested an add in the contract sum for the purchase of 2,000 cubic yards of offsite fill. Golden approved the request and instituted an add of $2,000.00 for the purchase of the offsite fill. Chavis had offered to supply the fill for $2,000.00, rather than at the unit price of $3.00 per cubic yard.

c) Change Order No. 3 which engendered turmoil both during the course of the work and during the trial requires some discussion of events that ensued prior to its issuance. During December of 1979, after Anderson had failed to meet the deadlines for completion of the building pads for Units A and C, methods of expediting the

work were discussed. The quality of the onsite fill, aggravated by the heavy rainfall, was such that substantial amounts of time passed between laying each lift of fill. Chavis recommended the use of drier offsite fill on Units A and C at a cost of $1.50 per cubic yard. Golden declined to treat this item as an extra. Subsequently, in early January, Chavis reported to Golden that Unit C could be completed in a timely manner if offsite fill was utilized. Golden then agreed to split the cost of the offsite fill with Anderson, each to pay $8,625. Chavis promised that the work on Unit C would be completed within 3 or 4 days. Although the fill was purchased and the work performed, it was several weeks before the Unit C building pad was eventually completed because of heavy rainfall during January. Anderson and Chavis orally notified Golden of the rain delay during the last week of January and documented the days lost to rain in a letter to Carey dated February 8, 1980.

Change Order No. 3, including $2,665.00 for the removal of unsuitable material in Unit B and $8,625.00 for one-half of the cost of offsite fill for Unit C was prepared by Carey and signed by him on January 28th. On or around the same day, Golden discovered that due to the rain delay, Anderson had just begun to bring in the offsite fill. By letter dated January 30, 1980, Golden informed Anderson that although it was Anderson's responsibility to provide the material to fill the site, Golden had gratuitously offered to pay part of the cost of offsite fill in order to expedite the work. Chavis received the change order and signed it on March 7, 1980. On March 24th, Golden struck through the second item, for the offsite fill, and executed the change order, leaving the $2,665.00 item. He then sent the revised change order to Anderson, pointing out the stricken item and explaining that he had reversed the amount for the offsite fill because of his discovery that Anderson had raised a number of matters which would require an adjustment of the contract price, over which Golden did not intend to negotiate. At trial, Golden explained that his decision not to pay was based on Chavis' failure to complete the work within the time specified in their verbal agreement.

d) Change Order No. 4, dated March 19, 1980, was for $4,484.00 for storm drainage revisions due to interference with a previously undiscovered city force main and for an additional manhole. Chavis did not execute this change order because he disagreed with the amount. Carey had reduced the amount due submitted by Anderson.

e) Change Order No. 5, dated June 19, 1980, for $1,466.00 authorized payment of the amounts claimed by Anderson which had been removed by Carey in preparing Change Order No. 4. Chavis also refused to execute this change order.

14. In addition to these authorized change orders, by letters dated February 20, 1980, Anderson submitted requests for adds of $10,350.00 for 6,900 cubic yards of fill to be used as a bridging lift for Unit D and $46,847.50 for 18,739 cubic yards of fill which represented the quantity of fill required to bring the site to the final grades above and beyond the quantity indicated by Carey's drawings. Both requests were denied. In February, 1980, at a meeting held at Sambo's Restaurant attended by Carey, Chavis and others, Chavis notified Carey that the settlement plates had indicated a variance in the elevations noted on the Carey drawing and the actual existing ground elevations. Carey requested an independent survey. Joseph Helmly of Helmly, Purcell & Associates, an engineering and surveying firm, performed a survey of the site in March of 1980.

Helmly compared the quantity of fill required to bring the site to final design using the elevations of contours on Carey's drawing with the amount of fill needed based on his survey of the existing ground level and found that 7,895 cubic yards of fill above and beyond that indicated by Carey's August 23rd drawing would be required to reach the finished grades.

Helmly also calculated the amount of material needed to fill ditches on the site, some of which did not appear on Carey's drawing.

Carey and his assistant, Ron Juhnke, conceded that not all of the ditches shown on the topographic map on which they relied were reflected on their sitework drawings. Anderson was put on actual notice of the existence of the drainage ditches, however, by the soils report contained in the Specifications. Moreover, he had a duty to inspect the site himself in order to verify site conditions and to note any discrepancies with the drawings. Helmly calculated that to fill the ditches not shown would require 3,353 cubic yards of fill. And if one and one-half feet of top soil were stripped from the sides and bottom of the ditches, an additional 2,541 cubic yards would be needed. The total amount of fill required over and above that indicated by the Carey drawings, according to Helmly's calculations, was 13,789 cubic yards in compacted state. Allowing for a 30% increase in volume in fluffed condition, this translates into 17,926 cubic yards. Helmly's calculations were not proffered and the difference in his final figure and Chavis' estimate of 18,739 cubic yards was not explained.

At the time that Helmly surveyed the site, fifty to seventy-five per cent of it had been cleared and the ditches had been filled. Helmly testified that he did not take into account the six-plus inches of soil stripped away in the clearing process. He also testified that the omission of some of the ditches from Carey's drawing was immaterial because, viewing the job overall, the sitework "balanced out."

Helmly also compared the contours on Carey's drawing with the spot elevations shown on a topographic map prepared by Leigh Gignilliat in 1970 which had been verified as accurate by Golden's civil engineer, Roy Hussey, and on which Carey had relied in preparing his site plans. He found them remarkably similar. Carey utilized contours spaced at two-foot intervals rather than at one-foot intervals. Although there was a great deal of testimony that one-foot contour intervals were customarily used in the Chatham County area, Chavis testified that the two-foot contour intervals did not cause him problems. The Gignilliat drawing showed spot elevations between eight and six feet whereas the contour lines on the Carey drawing, by their very nature, showed no elevation below eight feet. Apparently, Chavis did not utilize the process of interpolating between two contour lines in order to determine elevations lower than eight feet. Though spot elevations may have been more useful to Chavis, the Carey drawing was not defective because of the use of two-foot contour intervals, particularly in view of the fact that the specifications disclosed numerous elevations below eight feet. At any rate, Helmly concluded that the elevation differences on the two drawings were minimal.

Helmly's comparison of the Gignilliat and Carey drawings demonstrated that the omission of the ditches and the minimal elevation discrepancies ultimately made no difference in the work on the McAlpin Square site. The yardage reflecting the amount of material necessary to fill the ditches will therefore be disregarded. The Court also finds that the testimony regarding the amount of fill needed to reach final contours based on existing ground elevations as compared with the quantity needed according to the contours on Carey's drawing is unreliable to the extent that Helmly did not take into account the amount of soil stripped away in clearing the site.

The difference in cubic yardage actually required and that required according to the Carey drawing, as calculated by Helmly, was 7,895 cubic yards. This figure translates into 10,263 cubic yards in fluffed condition. If one-half of the site had been cleared with a maximum loss of .5 foot of top soil, approximately 7,698 cubic yards (in fluffed condition) [2] more than required by the Carey drawing would have to be placed on the site to reach final elevation. There are several ways to account for this apparent discrepancy between the existing ground elevations and those indicated on the Carey drawing. Chavis could simply

---

**2.** Concededly, this figure is somewhat arbitrary. However, without more data than was presented, a more accurate amount cannot be calculated.

have failed to accurately interpolate between the contours to reach the actual ground elevations. However, his discovery of a discrepancy is supported by Helmly's survey. The defendant suggests that the variance can be explained by Helmly's failure to take into account the stripping of up to six inches of soil during the clearing process. Because Carey relied on the Gignilliat topo to prepare his drawing, it seems logical to infer from the evidence of minimal differences in the Carey and Gignilliat elevations that only minimal disparities existed with regard to the existing ground elevations. It is probable, however, that the ground elevations changed to some extent between 1970, when Gignilliat prepared his topo and 1979, when Carey drafted his plans. Whether this was indeed the case could have been demonstrated to Carey had Roy Hussey, who was employed to verify the Gignilliat topo, actually checked the spot elevations. That he did not do so was established at trial by his own admission that he had never done a complete topo himself but had only performed spot checks on the borders of the site.

The Court finds that the evidence preponderates in favor of the plaintiff and credits Helmly's testimony insofar as it establishes that some amount of fill was required above and beyond that indicated by the Carey drawing. The Court finds this amount to be 7,698 cubic yards. Because, as will be discussed, onsite fill was or should have been available to correct this deficiency, the unit price for onsite fill, $2.50 per cubic yard, will be employed to determine the cost of the additional fill.

15. On November 14, 1980, nearly two months after removing his crew from the site, Anderson submitted a pay request in which he included a claim of $219,729.00 for 73,243 cubic yards of offsite fill at $3.00 per cubic yard. This figure reflects a truck count kept by Chavis during the course of the project. At trial, Chavis testified that 85,013 cubic yards of offsite fill were hauled onto the site, the cost of 73,243 cubic yards

of which has not been paid by Golden. Chavis itemized the total amount, as follows:

| | | |
|---|---|---|
| 1) | Difference in Carey and Gignilliat plans: | 18,739 cu. yds. |
| 2) | 2.83 acres lost from retention areas because of easements × depth of 10 ft.: | 41,000 cu. yds. |
| 3) | Change Order No. 1: | 6,625 cu. yds. |
| 4) | Raising paved area one inch: | 2,000 cu. yds. |
| 5) | Replacement of unsuitable material: | 2,038 cu. yds. |
| 6) | Initial lift on Unit D: | 6,900 cu. yds. |
| 7) | Initial lift on Unit C: | 2,000 cu. yds. |
| 8) | Lift prior to surcharge on Unit C: | 5,750 cu. yds. |
| | TOTAL: | 85,013 cu. yds. |

The first item has previously been discussed, as have the seventh and eighth items both of which were subjects of change orders, albeit that the eighth item was later reversed. The sixth item was also the subject of a request for a change order, which was denied. The Court is puzzled by the inclusion of the third item. Change Order No. 1 authorized the payment of the purchase price of 6,625 cubic yards of *onsite* fill at $2.50 per cubic yard. Whether, as appears likely, the plaintiff eventually used offsite fill to raise the site as required by Change Order No. 1 and therefore seeks payment of the difference in the unit price for on and offsite fill, $.50 per cubic yard, was never explained on the record. Subtracting from the total the items for which payment was made (at least in part) leaves 76,388 cubic yards of offsite fill for which no payment was made. As will be noted, this amount correlates very closely to Chavis' truck count.[3] Other than the authorized

---

3. The evidence with regard to the 73,243 cubic yards of offsite fill was extraordinarily confus-

ing. At his deposition, Chavis could not account for the use of this quantity of offsite

change orders and the denied requests for change orders, the record does not contain any indication that Chavis submitted claims for an increase in the contract sum based on the proposed use of offsite fill, until the final pay request in November, 1980. The contract required the contractor to give notice of a claim for an increase in the contract sum "within twenty days after the occurrence of the event giving rise to such claim." (General Condition 12.3.1). Failure to comply with the stipulated procedure would render the claim invalid.

Aside from this technical defense to the claims for items 2, 4, and 5, another question arises with regard to the 41,000 cubic yards of offsite fill allegedly required because of the depletion, in mid-May, of the retention ponds. Chavis calculated that 2.83 acres of fill were lost due to the existence of the easements. That Chavis had notice of the easements which were to remain undisturbed has already been discussed. Moreover, he based his assessment of the deficit on excavation of the pits to a depth of ten feet. There is no doubt that more fill was available in the retention ponds, but because of the construction technique implemented, that is, the replacement of the overburden into the ponds after removal of the good fill, the contractor could not retrace his steps and reach the concededly available fill after he realized his miscalculation of the quantity of fill he could excavate from the ponds. The owner and contractor had agreed upon utilization of this method of disposal of the overburden but the contract did not control the depth to which the ponds could be excavated as long as the ponds were left at a maximum plus-one elevation after replacement of the overburden. Chavis did not know the depth to

which the ponds had been excavated. Had Chavis been aware of the easements from the beginning of the work, as he should have been, he could have changed his excavation technique in order to obtain more onsite fill. Anderson conceded that the retention ponds would have yielded sufficient fill if not for the placement of the overburden into the bottom of the ponds after excavation of the usable fill.

Chavis testified that 111,396 cubic yards of fill was excavated from the retention ponds. Other testimony and documentary evidence, based on cross-sectioning of the retention ponds after excavation of the fill, demonstrated that the figure is closer to 90,000 cubic yards. According to Chavis, 85,013 cubic yards of offsite fill was hauled onto the site. Thus, the amount of fill actually used exceeded by approximately 60,000 cubic yards Chavis' estimate that the job would require 114,000 cubic yards of fill. The natural inference to be drawn from the foregoing facts is that Chavis incorrectly estimated the amount of fill needed in preparing the plaintiff's bid. When it became apparent to him and to Anderson that the job would cost more than they had calculated, they decided to seek an increase in the contract sum. Their failure to request increases in the contract sum in accordance with their truck counts each month supports the conclusion that they fully expected to bear the expense of the offsite fill in acknowledgment of their obligation to fill the site to the final grades, no matter how much fill was required or where the fill was obtained. The plaintiff now seeks to recoup the costs of the offsite fill incurred because the construction method they utilized failed to yield an adequate supply of borrow material.

---

fill. For instance, his truck count for October showed that 9,000 cubic yards had been hauled onto the site. However, he submitted a claim for only 2,000 cubic yards. He also testified that one-half of the 73,243 cubic yards of offsite fill was used before he depleted the retention ponds, as a mixture with the onsite fill. There was some evidence of the use of offsite fill to construct haul roads and plaintiff's counsel suggested that offsite fill was used for filling ditches. Indisputably, no claims for change

orders were submitted with regard to the use of offsite fill for haul roads or filling ditches. Based on the similarity of the figures, the Court can only conclude that by the time of trial, Chavis had found a way to account for the 73,243 cubic yards, in the manner set out above. Because of the inclusion of some items which were never explained, the inconsistencies in his deposition and trial testimony, and his continued confusion at trial, the Court cannot find Chavis' calculations credible.

The record is devoid of evidence that Carey misrepresented the amount of fill available in the retention ponds and the defendant should not be saddled with expenses incurred by the plaintiff due to his own miscalculations with regard to the job. The defendant should not be required to increase the contract sum by the price of the offsite fill which the plaintiff had no evidenced intention of claiming as an extra at the time he planned to purchase it. Moreover, a claim for an add two months after Anderson's crew left the job fails to satisfy the contractual provision governing the procedure for asserting claims for increases in the contract price.

16. In March, 1980, after a meeting on the site of the project, Golden set up a new timetable for completion, as follows:

1) C Unit [Kroger]—overburden must be completely off site by March 19 . . . 2) B Unit—overburden is to be completed and on site by March 14 with consolidation completed and overburden removed no later than April 26 . . . 3) D Unit— Overburden is to be completed and on site by April 2nd with consolidation completed and overburden removed no later than May 17 . . . 4) Remainder of work—all of the remaining work is to be 100 percent completed and all of your men and equipment off the site on or before June 1st. This would include the consolidation.

Unit A had been completed in early February. The surcharge (overburden) was removed from Unit C on March 19, 1980. Final density tests on Unit B were performed on April 25, 1980, and Whitaker issued his certification of completion on April 28, 1980. On Unit D, the surcharge was removed on May 30, 1980. Whitaker's letter certifying completion was dated June 30, 1980. Whitaker issued a qualified certification of completion of the parking area on August 15, though he testified that he could have done so as early as June 30th. His certification was conditioned on removal of unsuitable material, regrading and recompaction.

Delays in completion of the work in accordance with the new schedule resulted in part from continued rainfall and the presence of the general contractor's crew whose materials and supplies interfered with the progress of the sitework. The parking lot area was found to contain unsuitable material which also delayed the filling of the site. Golden contributed substantially to this delay by neglecting to deliver written authorization of the removal and replacement of the unsuitable material. Anderson stood ready with his equipment to perform the work for three weeks awaiting Golden's go-ahead. When no authorization was forthcoming, Anderson withdrew his equipment. A picket of the site in May halted work for two or three days. During July, Anderson's crew was hampered by the presence of raw sanitary sewerage flowing into the storm line. Together with McDevitt & Street's people and city personnel, Anderson undertook a clean-up operation. This further delayed completion.

During a substantial part of the summer months, Anderson's crew was rough-grading the parking lot area. After they had completed the grading, McDevitt & Street's base subcontractor noted disparities in the grades. Chavis testified in his deposition that McDevitt & Street "was having a problem with the grades that we had set," (Chavis Deposition at 100), and that Anderson therefore undertook to correct the inaccuracies by preparing a grid system and by regrading, in doing so, raising the area to be paved one inch. Though Carey stated at trial that he thought the grid system was unnecessary, he did check and approve the grid system and raising of the site. Anderson does not seek to recover the cost of preparing the grid system. He does, however, seek recovery of $7,000.00 which he paid to Shuman, McDevitt & Street's paving subcontractor, for fill brought in by Shuman to correct the disparity. Apparently, the correction of the grades by raising the area one inch also accounts for the 2,000 cubic yards of offsite fill included in Chavis' itemization of the offsite fill used on the site.

17. Pursuant to Golden's inquiry, Carey submitted his opinion on July 24, 1980, that

just cause existed for termination of Anderson's contract. That same day, Golden memorialized by letter a conversation with Joe Whitaker in which Whitaker opined that more than $15,000.00 worth of work remained to be done under the Anderson contract. Golden had previously given Anderson and his bonding company, Sentry Insurance Company, notice that the contract would be terminated if the work was not completed in a timely manner. Accordingly, by letter dated July 24, 1980, Golden terminated the contract because of the "lengthy delays and failure to complete the job within the times provided." (Defendant's Exhibit 6–49).

Anderson, by counsel, objected to the termination and offered to undertake to complete portions of the work. After a telephone conversation with Golden on August 4th, Anderson, again by counsel, reiterated his offer to perform mutually agreed-upon items of work—filling an overexcavated area of retention pond B and rough-grading behind Unit B. Anderson's bonding company reconfirmed this offer and set a ten-day period for completion. Golden's attorney contacted Anderson's attorney on August 11th and set forth the terms and conditions for Anderson's return to the job. It was understood that Anderson would be permitted to do the work in order to mitigate losses and that the notice of termination would not be withdrawn. On August 12th, Golden withdrew permission to proceed pending resolution of certain matters at an onsite meeting with Anderson, McDevitt & Street personnel, Carey and others. On August 20th, Golden reinstituted the letter agreement. In the meantime, Golden hired other contractors to perform certain items under the Anderson contract.

18. During the August onsite meeting, Anderson discovered that McDevitt & Street was using plans dated December, 1979, which showed several different and additional grades than those shown on Anderson's plans, the August 23rd drawings as revised in October. Some of the finished floor level elevations for sidewalk and curb areas were different on the two sets of plans and some of the final elevations did not appear on Anderson's plans.[4] Anderson was required to leave the site at eight inches below finished floor level, thus he had to know the correct finished floor levels in order to properly grade the site.

18A. Except for certain items which will be discussed hereinafter, Anderson completed the sitework and pulled his crew from the development site on or around September 17, 1980. He has not received payment on pay request No. 9 for $7,776.00; although Golden drew the check for payment, Golden's bank refused to honor it. Pay request No. 10 was itemized as follows:

| | | |
|---|---|---:|
| 1. | Contract retention (includes total amount of Change Order No. 3, before reversed) | $ 63,000.00 |
| 2. | Offsite fill (73,243 cu. yds. at $3.00/cu. yd. and 350 cu. yds. at $2.50/cu. yd. used as pipe backfill by utility contractor) | 219,875.00 |
| 3. | Regrading parking area after utility contractor disturbed it | 5,250.00 |
| 4. | Storm drain revisions | 6,600.00 |
| 5. | Interference manhole | 950.00 |
| 6. | Payment bond premium on additional work | 2,720.00 |

4. At the southeast corner of Unit D, the December plan shows a finished elevation of 13′6″ where Anderson's plan shows nothing. An elevation of 14′3″ for the sidewalk and 13′9″ for the curb, not shown on Anderson's plan, appear directly in front of Unit D on the December plan. The same elevations, omitted from Anderson's plan, are given for the sidewalks and curbs in front of Unit C, and the Unit B sidewalk and curb area elevations are different on the two plans.

Item 2 has previously been discussed and revised, except as to the 350 cubic yards allegedly used as pipe backfill. No evidence was offered as to this item. Nor was any evidence offered with regard to Item 3. Change Order No. 4 included $5,485.00 for the storm drainage revision. Chavis refused to execute it because he disagreed with the price; however, he did not explain why the assigned cost was inaccurate. Item 5 was included in Change Order No. 5, which Chavis also refused to sign. Again, he did not explain why he refused to do so. After revising the figures in accordance with the foregoing discussion, the plaintiff's tenth pay request includes the following:

| | | |
|---|---|---|
| 1. | Unpaid Contract Sum | $63,000.00 |
| 2. | Additional fill required because of discrepancy in plans (7,698 cu. yds. × $2.50/cu. yd.) | 19,245.00 |
| 3. | Payment bond premium | 2,720.00 |
| | TOTAL | $84,965.00 |

The plaintiff also seeks recovery of additional costs incurred in completing the work and of fees paid to third parties, as follows:

| | | |
|---|---|---|
| 1. | Additional Costs Paid to Shuman Construction Company | $ 7,264.26 |
| 2. | Grade crews (13 days at $1,050.00 per day) | 13,650.00 |

The reason for the second item was not clear but it possibly represents the regrading performed after implementation of the grid system.

| | | |
|---|---|---|
| | Paid to Third Parties | |
| 1. | Helmly, Purcell field topo | $ 572.00 |
| 2. | Helmly, Purcell calculations | 1,863.00 |
| 3. | Helmly, Purcell calculations | 325.00 |
| 4. | Bonding company attorney's expenses | 5,168.79 |

Anderson gave notice of bad faith to the defendant and therefore seeks attorney's fees totalling $26,803.

19. At approximately monthly intervals throughout the job, Anderson submitted applications for periodic payments accompanied by signed lien waivers and contractor's affidavits. Anderson routinely signed these lien waivers until May 16, 1980, when his attorney objected to signing the lien waiver accompanying pay request No. 7. There was a conflict in the testimony as to whether an understanding existed between the parties' attorneys to limit the effect of the May 16, 1980 affidavit. Anderson testified that he understood that the May 16th affidavit as well as the other affidavits were lien subordination documents *only,* as opposed to waivers of lien rights. According to Anderson's attorney, this was indeed the agreed-upon position as to the affidavit accompanying pay request No. 7. Golden's attorney did not recall reaching such an agreement.

The illogic of Anderson's stance with regard to the partial lien waivers and contractor's affidavits is apparent upon reviewing the letter attached to and incorporated into the contract signed on September 12, 1979. In that letter, which Anderson read and signed, Golden informed the contractor that *at such time* as the prospective lender filed its mortgage of record on the property, the contractor would be required to subordinate any lien rights to the lender's first mortgage. Golden obtained a lender in March, 1980, and requested the execution of a lien subordination agreement. Thus, the lien waivers and contractor's affidavits signed during the interim period before acquisition of the mortgage could not logically have been construed as mere lien subordination documents. And since Anderson was notified in March of 1980 of the necessity of executing a lien subordination agreement, it is difficult to believe that two months later he or his attorney could have interpreted the lien waiver documents attached to pay request No. 7 as a lien subordination agreement.

20. Golden counterclaimed alleging damages as a result of the delay in completion of the sitework which necessitated additional expenditures, for monitoring and inspection work performed by Whitaker Laboratory and Roy Hussey as well as for payment of construction loan interest. He also alleges that by virtue of the delay, his tenants could not enter the premises as early as they had hoped and thus he seeks recovery of lost rentals. In addition, he contends that he paid Ledbetter Construction Company $1,237.33 [5] and Shuman Construction Company $7,547.72 [6] to complete various items which were within Anderson's contract and were not performed by Anderson. According to Whitaker's assessment of the work performed by Shuman, only $6,443.25 of the amount paid Shuman can be attributed to the Anderson contract. Golden also seeks recovery of $500.00 for the improper location of a catch basin; however, the Court can find no evidence to support this item. Therefore, it will be denied.

Of the other items not completed by Anderson, the majority were extras under the contract. Two items of the storm sewer work remain to be completed; however, the City of Savannah precluded completion of certain aspects of that work. The installation of drainage pipes to the Casey Canal, Hussey testified, will cost approximately $800. Anderson also failed to comply with the contractual provision requiring him to keep a truck count of the good fill removed from the retention basins. Hussey performed a cross-section of the pits to ascertain the quantity.

Golden alleged further damages as a result of the filing of the materialman's lien, basing his theory of recovery on slander of title. He testified, however, that he has not had a bona fide offer for a sale or joint venture.

**5.** This figure represents the cost of mucking the top foot of an area in the northwest corner of the rear parking area and placing the material on the bank of retention pond B to correct the angle of the slope left by Anderson.

**6.** According to Whitaker, only two items in Shuman's bill are attributable to Anderson's

## CONCLUSIONS OF LAW

### Introduction

■ Before embarking on an application of the legal theories to the facts of this case, it is necessary to determine whether the plaintiff may sue on the contract and whether the defendant may rely on the terms of the contract. It has been consistently held in Georgia that where the contract stipulates that final payment to the contractor shall be due and payable upon the issuance of an architect's certificate of completion, it is essential to allege compliance with this condition in order to maintain an action to recover the balance due under the contract or to enforce the collection thereof by foreclosure of a materialman's lien. *Southern Manufacturing Co. v. R.L. Moss Manufacturing Co.*, 13 Ga.App. 847, 856, 81 S.E. 263 (1913). The Owner-Contractor Agreement provides that final payment shall be due to the contractor when the work has been completed, the contract fully performed, and a final certificate for payment has been issued by the architect. The only certificate, other than those for progress payments, which appears in the record is one given by the architect to the construction lender for the purpose of loan disbursements. Though the plaintiff argued that this certificate is equivalent to the certificate of final payment contemplated by the contract, the Court cannot so conclude. It does not resemble the certificate, which must be acquired prior to proceeding with a suit on the contract.

The condition will be excused where the owner "by his own act rendered it impossible for the contractor to secure the approval and certificate of the architect...." 17A C.J.S. § 499(7), at 758. The Georgia courts follow this reasoning: "if the completion of

contract: the placement of foreign borrow over a drain pipe along Victory Drive and grading for curbs and gutters. Backfilling under the curb line behind Sambo's and around the catchbasin in the front parking lot would have been an extra under the Anderson contract.

the contract was prevented by the party otherwise having the right to insist on the architect's certificate, this is equivalent to completion of the contract. . . ." *Gellis v. B.L.I. Construction Co.,* 148 Ga.App. 527, 535, 251 S.E.2d 800 (1978). *See also Allen v. Moore,* 77 Ga.App. 426(1), 49 S.E.2d 121 (1948).

■ Golden terminated Anderson's contract and ordered him off the job. He subsequently reinstated Anderson only to allow him to mitigate losses, with the express understanding that the notice of termination would remain effective. Thus, the owner by his own act prevented completion in accordance with the terms of the contract thereby making it impossible for Anderson to secure the architect's certificate. Moreover, the owner substantially contributed to the lengthy delays and failure of Anderson to complete his work according to the timetable, which were the reasons given for termination of the contract.

■ The plaintiff vigorously asserts that the defendant cannot rely on the terms of the contract because he committed a breach by failing to agree with the architect as to the appointment of a project representative. Although this omission undoubtedly caused delays in completion of the work, the Court cannot find that Golden breached the Owner-Contractor Agreement since the provision therein for the nomination of an onsite representative was not mandatory. The plaintiff seeks to take advantage of the concededly mandatory term of the Owner-Architect Agreement with regard to the appointment of a project representative by arguing that as a beneficiary of the obligations created by the Owner-Architect Agreement, damage to him was a foreseeable consequence of the omission. *See Rhodes-Haverty Partnership v. Robert & Co. Associates,* 163 Ga.App. 310, 312, 293 S.E.2d 876 (1982). With this much I agree, but I cannot follow such reasoning any further (particularly where there was little if any evidence upon which to base a finding of a breach of the Owner-Architect Contract as opposed to a mutual modification) to hold

that the defendant cannot therefore rely on the terms of the Owner-Contractor Agreement.

Therefore, I find that Anderson may sue on the contract despite the architect's failure to issue a certificate of final payment and that Golden is entitled to rely on and enforce the terms of the contract.

■ 1. In entering the lump sum contract for the site and storm drainage work, Anderson held himself out as experienced in earthwork and storm drainage system work. He was thus bound to exercise reasonable professional skill in estimating the cost of the work and in performing the job. *See Day & Zimmerman, Inc. v. Blocked Iron Corporation of America,* 200 F.Supp. 117 (E.D.Pa.1960). During the course of the project, Anderson found that he had to perform additional work and incur additional expenses in order to complete the job according to the specifications. He now seeks to recover some of these costs as an "extra," based on the unit prices set out in the contract. He premises this right to recovery on two theories: (a) the contract required the use of onsite fill and made offsite fill an extra; (b) the plans and specifications were defective, therefore the job could not be performed as contemplated, requiring Anderson to expend more money and effort than he had planned.

a) The Court must construe the contract to determine whether it called for the exclusive use of onsite fill from the borrow pits. If it did not, a second question arises as to whether the parties, by their conduct, modified the contract to make offsite fill an extra.

■ Some elementary rules of construction guide the Court in making its determination. A contract will be interpreted, insofar as possible, to give a reasonable construction to all parts of the contract, *Morrison-Knudson Co. v. United States,* 184 Ct.Cl. 661, 397 F.2d 826, 842 (Ct.Cl.1968), and constructions of contract provisions as conflicting will be avoided unless it is unreasonable to do so. *Id.* " 'Where the plans and specifications are by express terms

made a part of the contract, the terms of the plans and specifications will control with the same force as though incorporated in the very contract itself.'" *Warren v. Gray,* 90 Ga.App. 398, 401, 83 S.E.2d 86 (1954) (quoting 9 Am.Jur. § 11, at 11).

■ The pertinent portions of the contract were set out above. The contract provided that the contractor shall furnish all materials and supplies necessary to perform the work. The specifications provided that the contractor could acquire additional fill from offsite locations if he chose to do so. The post-bid addendum contained a "revision" or "clarification" which required the excavation of borrow material from adjacent retention pond areas.

The contract as finally executed by the parties indisputably required Anderson to excavate the retention areas. When Anderson originally bid the job, the excavation of the retention ponds was not an integral part of the project. After discussions with Carey however, the excavation of the retention ponds, making available onsite fill, became an important facet of the work. The "revision" in the post-bid addendum obviously pertains to the added requirement of excavating the retention basins.

Nowhere, however, does the contract require that *only* the material obtained from the retention ponds should be placed on the site. This point is emphasized by Carey's letter of September 8, 1979, which he termed a modification but which is more appropriately characterized as an architect's interpretation under Article 2.2.8 of the General Conditions. In the letter, he carefully explained that the post-bid addendum was not intended to preclude the use of other fill.

The Court finds that the contract did not limit the contractor to the use of onsite fill, thereby making offsite fill an extra. The provision for a unit price for offsite fill does not change this conclusion. The contract contains a stipulated price for offsite fill to be used in the event that the owner, at his own or another's recommendation, concluded that offsite fill was needed for some purpose not contemplated in the original specifications.

■ Because on several occasions Chavis requested and Golden on two occasions (Change Order Nos. 2 and 3, though the latter was reversed) authorized the purchase of offsite fill, the question arises whether by their course of conduct, the parties modified the contract to make offsite fill an extra on all occasions. In the Court's opinion, the parties did not modify the contract by their conduct. Golden authorized the purchase of offsite fill when, because of the moisture content of the onsite fill, the site could not be proofrolled without a bridge layer of offsite fill, a condition surely not foreseen by either party. Chavis only requested such authorization when the onsite material was saturated to the point that it could not be proofrolled or would entail delays if used. As discussed above, he did not request change orders with regard to much of the offsite fill allegedly utilized on the site.[7]

■ Thus, the Court cannot conclude that the parties treated offsite fill as an extra to the contract entitling the plaintiff to recover extra compensation. The Court does find, however, that Golden's authorization of an increase in the contract sum for offsite fill used as a bridging lift to alleviate unforeseen proofrolling problems estops him from arguing that offsite fill was never an extra. Therefore, when Whitaker Laboratory personnel and Chavis recommended in February of 1980, that a bridging lift of offsite fill be placed on Unit D, at a cost of $10,350.00, Golden should have authorized the purchase of the fill. Golden might have done so had he been presented with such a request, but it appears that Carey did not transmit the request to Golden. (See printed message on P–42).

---

**7.** The failure to comply with the provision for notice of claims for an increase in the contract sum bars recovery of the extra compensation. *See Goodwin, Inc. v. City of Lafayette,* 418 F.2d 698 (5th Cir.1969); *see also E.C. Ernst, Inc. v. General Motors Corp.,* 537 F.2d 105 (5th Cir. 1976).

As to whether the use of offsite fill was an extra in unforeseen circumstances other than the inability to proofroll situation, "[i]t is an elementary principle of contract law that in order to recover for 'extras', [the contractor] must show that they are in fact extras." *E.C. Ernest, Inc. v. Koppers Co., Inc.,* 476 F.Supp. 729, 754 (W.D.Pa.1979). Extra or additional work is work not contemplated in the original specifications. When the work performed is covered under the lump sum contract, the contractor cannot consider the cost of performance as an extra. *Baton Rouge Contracting Co. v. West Hatchie Drainage Dist.,* 304 F.Supp. 580, 585 (N.D.Miss.1969); *Continental Casualty Co. v. Wilson-Avery, Inc.,* 115 Ga.App. 793, 156 S.E.2d 152 (1967). In a fixed sum contract, a contractor is not entitled to additional compensation simply because unforeseen difficulties are encountered. *United States v. Spearin,* 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); *Jefferson Construction Co. v. United States,* 183 Ct.Cl. 720, 392 F.2d 1006, 1007 (Ct.Cl.1968); *Baton Rouge,* 304 F.Supp. at 585. However, if the services are not contemplated by the original agreement and are necessary to perform the work, the law will imply a promise to pay for the extra services. *Puritan Mills, Inc. v. Pickering Constr. Co., Inc.,* 152 Ga.App. 309, 262 S.E.2d 586 (1979).

Under the agreement between Anderson and Golden, Anderson was clearly required to bring the site to the final grade levels. Anderson testified that he understood that he had to fill the site no matter how much fill was required. The contract did not specify the amount of fill to be placed on the site. The quality of the material, though known to be wet and slow to drain, was an unforeseen circumstance to all the parties. This case falls within the rule of *Spearin. Puritan Mills* is not controlling here because the service—filling the site—was clearly contemplated by the contract. Anderson cannot recover the cost of the offsite fill as an extra merely because unforeseen difficulties arose. There was no supplemental agreement to pay. Indeed, Golden repeatedly informed Anderson and Chavis that he would not pay for the offsite fill they chose to use because of the poor quality of the onsite fill. Nor is recovery in quantum meruit warranted because "the required performance [does not] fall(s) outside the terms of the original obligation." *Brookhaven Landscape and Grading Co. v. J.F. Barton Contracting Co.,* 676 F.2d 516, 521 (11th Cir.1982).

As with any other contract, Anderson assumed a risk when he bid that he would not be able to perform the contract for the amount of his bid. Where the cost of compliance exceeds the contemplated cost, the contractor has little choice but to bear the burden of additional expenses. *See Pitman v. Dixie Ornamental Iron Co.,* 122 Ga.App. 404, 177 S.E.2d 167 (1970); *Talerica v. Grove Park Plumbing Service, Inc.,* 103 Ga.App. 591, 120 S.E.2d 36 (1961).

b) To overcome the rule that extra compensation is not recoverable when unforseen difficulties are encountered during the course of performing a fixed-sum contract which is capable of performance, courts have found that an implied warranty by the owner that conditions are as described in plans and specifications may be breached by defective plans. *Jefferson Construction Co. v. United States,* 183 Ct.Cl. 720, 392 F.2d 1006, 1014 (Ct.Cl.1968). The warranty is not vitiated by standard clauses disclaiming responsibility for the accuracy of data or requiring the contractor to verify the specifications by inspecting the site. *Hollerbach v. United States,* 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914). This is so because contractors cannot be expected to perform certain investigations such as soil borings. In order to calculate a bid, bidders must be able to rely on representations by the owner as to subsoil conditions and other nonobvious conditions. *Robert S. McKee, Inc. v. City of Atlanta,* 414 F.Supp. 957, 959 (N.D.Ga.1976).

The contract involved here specifically provided in several of the documents that the contractor was responsible for investigating soil and subsoil conditions, for visiting the site and familiarizing him-

self with local conditions, and for correlating the drawings and specifications with existing conditions. Ground elevations, utilities, and soil conditions as shown on the drawings were expressly not guaranteed to be correct. The contract contained no changed conditions clause, the purpose of which is to relieve the bidder of the risk of encountering adverse subsurface conditions. *Al Johnson Constr. Co. v. Missouri Pac. R. Co.,* 426 F.Supp. 639, 646–7 (E.D.Ark.1976). The contract thus squarely placed the risk of uncertainty as to site conditions on the contractor. The owner did not impliedly warrant the accuracy of his agents' investigations. *See Eastern Tunneling Corp. v. Southgate Sanitation Dist.,* 487 F.Supp. 109, 112 (D.Colo.1979).

 Even where no implied warranty exists, the owner may be liable because of misrepresentations of material facts about the site conditions. Thus, placing the risk of uncertainty on the contractor does not absolve the owner of the duty not to materially misrepresent conditions. In order to prevail on a claim of misrepresentation, the plaintiff must satisfy two requirements: that he was not reasonably able to discover the true facts for himself and that the misrepresentation was material. *McKee,* 414 F.Supp. at 959–60. What constitutes a reasonable ability to discover the true facts depends on the time constraints involved, the nature of the alleged misrepresentation, and whether the defendant expected that bidders would rely on the specifications and plans provided. *Al Johnson,* 426 F.Supp. at 647; *McKee,* 414 F.Supp. at 960.

 I have already found that the omission of the ditches and the elevation differences on the Carey plan as compared with the Gignilliat topo were, as a factual matter, immaterial, based on Helmly's testimony. At any rate, the drainage ditches were alluded to in the specifications, and it is apparent to the Court that had Chavis done a more careful inspection of the site, the ditches would have been revealed. Likewise, the plaintiff was put on inquiry notice of the easements and utility lines they contained. Thus, the plans and specifications were not defective in this regard.

 As to the quantity of fill which the Court has found that Chavis could not have included in his estimate of the amount of fill needed to raise the site to finished grade levels because of a variance in the existing ground elevations and those shown on the Carey drawing, the question is whether Anderson should have discovered the discrepancy himself, taking into account the time constraints, the nature of the defect, and the owner's expectations. The invitation to bid was issued on May 23, 1979. The bid opening was held on June 12, 1979. Anderson would have had to incur expenses to survey the site himself, with no assurance that his bid would be accepted. A more careful inspection of the site would not have revealed the discrepancy. *Cf. In re D. Federico Co., Inc.,* 16 B.R. 282, 287–8 (Bkrtcy.D.Mass.1981). The Court finds that Anderson and Chavis justifiably relied on the architect's plans in constructing the bid and in estimating the quantity of fill needed. As to Anderson's post-bid responsibility, the evidence demonstrated that he did discover, perhaps serendipitously, the variance and that he then made a formal request for an increase in the contract sum, based on the results of the independent survey requested by the architect. In the Court's opinion, Anderson acted as expeditiously as could be expected under the circumstances.

 The second prong of the test requires the plaintiff to establish the materiality of the misrepresentations. "[I]t will not be sufficient for the plaintiff to show that it was misled by the general conclusions made by the [owner's] agents ...; the plaintiff must show that the underlying factual data ... was inaccurate." *McKee,* 414 F.Supp. at 961. The plaintiff established through Helmly's testimony that the existing ground elevations differed from those shown on the Carey drawing, therefore the Court finds that the plaintiff carried its burden of showing that the underlying factual data was inaccurate. Thus, the plaintiff may recover the cost of

7,698 cubic yards of fill at $2.50 per cubic yard. The Court also concludes that the initial Helmly survey and calculations in March, 1980, were required by the owner's agent, the architect, and therefore this cost should be borne by the owner.

2. The Court has previously found that Anderson executed partial lien waivers with each pay request. Lien waivers are valid and enforceable under Georgia law. Ga.Code Ann. § 67–2001(2); O.C.G.A. § 44–14–361(b); *R.S. Helms, Inc. v. GST Development Co.,* 135 Ga.App. 845, 219 S.E.2d 458 (1975). Such waivers are enforceable even against the contractor's contention that his intention was only to subordinate his lien claim to that of the lender. *Id.* Waivers of lien rights must be distinguished from contractor's affidavits which in the usual course of business are sworn statements by the contractor that he has paid the subcontractors the reasonable value or agreed price of work done or material furnished. *Jackson's Atlanta Ready Mix Concrete Co., Inc. v. Industrial Tractor Parts Co., Inc.,* 139 Ga.App. 422, 228 S.E.2d 324 (1976). Only a sworn statement to such effect taken upon final completion of the work is a binding release of materialman's lien rights. *Bankston v. Smith,* 134 Ga.App. 882, 216 S.E.2d 634 (1975); *Massachusetts Bonding & Ins. Co. v. Realty Trust Co.,* 142 Ga. 499 (1914). The sworn statement with regard to the payment of the agreed price or reasonable value thereof does not refer to the contract price between the owner and the contractor. *Short & Paulk Supply Co. v. Dykes,* 120 Ga.App. 639, 171 S.E.2d 782 (1969). Hence, plaintiff's assertion that only a sworn statement taken at the completion of the work is binding, is inapposite in the case of lien waivers.

The language of the lien waivers and of the contractor's affidavit forms is clear and unambiguous:

Acknowledgment of Payment and Waiver of Right of Lien:

For valuable consideration in hand paid to the undersigned, in the amount of ————, receipt of which is hereby acknowledged to his (its) complete satisfac-

tion, the undersigned does hereby waive, release and relinquish any and all claims or rights of lien which he (it) may have upon the premises owned or leased by Golden & Company in the City of Savannah, State of Georgia for labor and material furnished to date on said premises.

Contractor's Affidavit:

[Affiant] ... on oath, deposes and says as follows ...

4. That the undersigned hereby waives and releases his right and the right of the above-referenced contractor to file a mechanic's or materialman's lien against said property.

The Court finds that the above-quoted language constitutes a partial waiver of lien rights. Therefore, Anderson, by executing the waivers, waived any lien rights with regard to the amount of the contract sum already paid. No lien may be asserted for an amount which would exceed the agreed-upon contract price, even though the cost of completion may exceed the contract sum. *Thompson v. Brannen Bldg. Supply,* 153 Ga.App. 4, 264 S.E.2d 498 (1980). In addition, the owner is entitled to deduct the cost of completion from the balance due. *Hausen v. James Development, Inc.,* 143 Ga.App. 265, 238 S.E.2d 265 (1977).

3. The defendant asserts that the filing of the mechanic's lien was wrongful and that it is therefore entitled to recover for slander of title in the amount of his compensable damages and for punitive damages. Georgia recognizes that the wrongful filing of a mechanic's lien may give rise to an action for slander of title. Here, however, the defendant has not established the elements necessary to state such a cause of action. Section 105–1411 of the Georgia Code Annotated, O.C.G.A. § 51–9–11 provides that an "owner of an estate in lands may maintain an action for libelous or slanderous words falsely and maliciously impugning his title, if any damage shall have accrued to him therefrom." The owner must allege and prove the publication of slanderous words (here, the wrongful filing of the lien), their falsity and mali-

ciousness, and special damages. *Copeland v. Carpenter,* 203 Ga. 18, 45 S.E.2d 197 (1947); *Schoen v. Maryland Cas. Co.,* 147 Ga. 151, 153, 93 S.E. 82 (1917). Aside from the absence of proof of malice, the defendant failed to demonstrate that he sustained special damage.

 4. There is no doubt that Anderson failed to timely complete the contract and failed to complete some portions of the work at all. That time was of the essence of the contract was made abundantly clear. "Time is of the essence" clauses are enforceable in Georgia. Ga.Code Ann. § 20–704, O.C.G.A. § 13–2–2. However, Georgia follows the English rule which allows recovery in quantum meruit by a plaintiff who is in substantial breach of the contract, as long as the breach is not willful or deliberate. *Martin v. Rollins,* 238 Ga. 119, 121, 231 S.E.2d 751 (1977). Except for some minor items of the contract, Anderson completed the rough-grading and storm sewer system work. The defendant accepted the benefit of this performance. Therefore, the Court finds that the plaintiff is entitled to recover the value of his labor and services which the Court finds to be equivalent to the unpaid contract sum, with set-offs which will be discussed hereinafter. The payment due shall include the full amount of Change Order No. 3. In the Court's opinion, it would be inequitable to allow the defendant to reap the benefits of Anderson's work without reimbursing him for the cost of the performance where the defendant authorized the work and then withdrew permission despite notice of the rain which made prompt performance impossible.

5. Ledbetter Construction Company and Shuman Construction Company completed certain items of the Anderson contract upon Anderson's failure to do so because of the termination of his contract. The defendant is entitled to offset $7,680.58 for the sums paid to these contractors against the plaintiff's recovery. *Ayers v. Baker,* 216 Ga. 132, 114 S.E.2d 847 (1960).

Hussey, Gay & Bell, Inc. submitted a bill in the amount of $2,038.00 for services performed in connection with the discovery, during the summer of 1980, of inaccuracies in the grade stakes in the parking lot area. A survey was conducted pursuant to the request by the general contractor or its project representative, after discrepancies were noted in the grade stakes set by Anderson's rough-graders. Anderson subsequently undertook to correct the grades. The owner is entitled to a set-off for the expenses incurred in discovering the discrepancies. *Id.*

 Anderson also seeks to recover additional costs incurred in correcting the inaccurate grades. It is well-settled that a contractor is not entitled to additional compensation for work necessitated by his own inadequate performance. 17A C.J.S. § 371(1). The plaintiff will not, therefore, be allowed to recoup the costs of correcting the grades. The claims of $7,264.26 which Anderson paid to Shuman for fill and of $13,650.00 for regrading are denied.

6. The remainder of both parties' alleged damages flow from the long delay in completion, primarily in the form of additional expenditures. The defendant also claims that he lost rental payments because of the delay, though the proof on this point was unconvincing since the outside dates contained in the leases for the tenants' entry into the premises were all met. Where each party proximately contributes to the delay, "the law does not provide for the recovery or apportionment of damages occasioned thereby to either party." *J.A. Jones Construction Co. v. Greenbriar Shopping Center,* 332 F.Supp. 1336 (N.D.Ga. 1971), *aff'd* 461 F.2d 1269 (5th Cir.1972). Anderson badly misjudged the job to the extent that he based his deadlines for completion on ideal conditions and offsite fill quality. Some delays resulted from Chavis' failure to carefully examine the plans and specifications. Golden aggravated the delays caused by the poor weather and quality of onsite material by failing to establish an expeditious method for approving procedures, settling disputes, and authorizing changes in the work. "It is well established that an owner has an obligation to facilitate

the work of a contractor and to not do anything that would obstruct or impede the contractor's work." *Niagara Mohawk Power v. Graver Tank & Mfg. Co.,* 470 F.Supp. 1308, 1322 (N.D.N.Y.1979). For these reasons and others discussed fully elsewhere, both party's claims for delay damages are denied.

■ 7. There is no basis for an award of attorney's fees to Anderson. Ga. Code Ann. § 20–1404; O.C.G.A. § 13–6–11 provides that "[t]he expenses of litigation are not generally allowed as a part of the damages; but if the defendant has acted in bad faith, or has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." Where there is a bona fide controversy or genuine dispute, an award of attorney's fees is precluded. *Eldon Industries, Inc. v. Paradis and Co.,* 397 F.Supp. 535, 543 (N.D.Ga.1975). Moreover, Georgia law does not allow attorney's fees under section 20–1404 where "the amount recoverable is considerably less than the amount sought," *Broyles v. Johnson,* 103 Ga.App. 102, 118 S.E.2d 734 (1961), because this indicates the existence of a genuine dispute. Based upon the foregoing findings and conclusions, it should be apparent that the Court was presented with a bona fide controversy. Attorney's fees are therefore denied.

### SPECIAL VERDICT AND ENTRY OF JUDGMENT

The Court having heard the evidence in the above-captioned case, now returns the following special verdict on the claims and counterclaims of the parties:

A. Amounts Due Plaintiff Anderson

1. Value of Performance $ 61,974.45
2. Change Order Requests for off-site fill, including Change Order No. 3 18,975.00
3. Reimbursement for extra fill required by elevation disparities on plans at $2.50 per cubic yard 19,245.00
4. Paid to Third Parties [Helmly, Purcell survey and calculations in Spring, 1980] . . . To be submitted by counsel

A. Amounts Due Plaintiff Anderson

5. Interest [Legal rate of interest, 7% per annum, to run from date of demand, November 30, 1980] TOTAL DUE PLANTIFF

B. Amount Due Defendant Golden

1. Shuman Construction Co. $ 6,443.25
2. Ledbetter Construction Co. 1,237.33
3. Hussey, Gay & Bell fee 2,038.00
4. Drainage pipes under canal 800.00
5. Interest [Legal rate of interest 7% per annum, to run from date of trial] TOTAL DUE DEFENDANT TO BE OFFSET AGAINST TOTAL DUE PLAINTIFF

### JUDGMENT

The foregoing special verdict having been found, the Court will enter judgment thereon fifteen (15) days from the date of the filing of this Order. Counsel for the parties shall submit those items indicated. Counsel are directed to review the figures set forth herein for correctness, to calculate interest in accordance with the foregoing instructions, and to furnish the Court with appropriate sums for final judgment.

It appearing that a lien was timely filed, the final judgment may include the same.